IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| EDWARD JEROME HARBISON,<br><br>Plaintiff,<br><br>vs.<br><br>GEORGE LITTLE, in his official capacity as Tennessee's Commissioner of Corrections, et al,<br><br>Defendants. | NO. 3:06-1206 |

COPY

Deposition of:

MICHAEL S. HIGGINS, M.D.

Taken on behalf of the Plaintiff

Taken before the Honorable Aleta A. Trauger

August 29, 2007

VOWELL & JENNINGS, INC.
Court Reporting Services
207 Washington Square Building
214 Second Avenue North
Nashville, Tennessee 37201
(615) 256-1935

APPEARANCES:

For the Plaintiff: STEPHEN M. KISSINGER
DANA C. HANSEN CHAVIS
Assistant Federal Community Defenders
530 S. Gay Street
Suite 900
Knoxville, TN 37902
(865) 637-7979

For the Defendants: MARK A. HUDSON
MARTHA A. CAMPBELL
Associate Deputy Attorney General
Civil Rights And Claims Division
2nd Floor, Cordell Hull Building
425 5th Avenue North
Nashville, TN 37202
(615) 532-2558

I N D E X

| | PAGE |
|---|---|
| Questions by Mr. Kissinger | 6 |
| Questions by Mr. Hudson | 55 |
| Futher questions by Mr. Kissinger | 91 |
| Questions by Judge Trauger | 99 |

E X H I B I T S

| | |
|---|---|
| Exhibit No. 1 | 90 |

The deposition of MICHAEL S. HIGGINS, M.D., was taken by counsel for the Plaintiff at the Federal Courthouse, 801 Broadway, Nashville, Tennessee, on August 29, 2007, for all purposes under the Federal Rules of Civil Procedure.

The formalities as to notice, caption, certificate, et cetera, are waived. All objections, except as to the form of the questions, are reserved to the hearing.

It is agree that Jackie Wisinger, being a Notary Public and Court Reporter for the State of Tennessee, may swear the witness, and that the reading and signing of the completed deposition by the witness are waived.

* * *

MICHAEL S. HIGGINS, M.D.

was called as a witness, and after having been first duly sworn, testified as follows:

THE COURT: Dr. Michael Higgins is the court-appointed expert to have his deposition taken by the parties.

And let me just ask as a preliminary. Dr. Higgins, I have furnished you the amended complaint and documents filed in association with it and the answer filed by the State, have I not?

THE WITNESS: Yes.

THE COURT: And I've given you the depositions of all of the experts in the case.

THE WITNESS: Yes. And I reviewed all of them.

THE COURT: And I've given you a copy of the new protocol for lethal injection?

THE WITNESS: Correct.

THE COURT: And have I solicited from you any observations or opinions that you have having reviewed all this material?

THE WITNESS: No.

THE COURT: And did I ask you when you were hired as the court-appointed expert if you had an opinion one way or

another about the death penalty?

THE WITNESS: You did. And at that time, my response was I'm undecided. And I still am.

THE COURT: All right. Very good. Shall we start with the plaintiffs, or have you all made a decision?

MR. KISSINGER: Sure. We'd be glad to start.

THE COURT: Okay. Is that all right with you, or do you wish to start? You're okay?

MR. HUDSON: I think the plaintiffs will start. Do we need to swear the witness in?

THE COURT: Yes, we do need to swear the witness in. Actually you did request to take his deposition.

MR. HUDSON: Well, we requested the report.

THE COURT: It doesn't matter. All right.

QUESTIONS BY MR. KISSINGER:

Q. Dr. Higgins, before we begin this

deposition, Judge Trauger mentioned the materials which she had provided to you.

After reviewing those materials, are there any other materials which you feel might be of value to you in fulfilling your task to the Court?

A. Well, with the stated task -- and maybe that's something we're talking about.

In terms of reviewing the protocol, no. I feel like I've seen the protocol and the testimony regarding that protocol from both sides. So to that extent, no, I feel like I have pretty good information regarding that.

Q. Dr. Higgins, have you been asked to render an opinion based solely on the protocol itself or on the protocol as it is carried out?

A. Maybe you could help me understand a little bit about the distinction between those two.

My understanding was I was asked to render an opinion regarding the current protocol as it's written and described in the official document.

Q. In reaching your opinions or conducting your examination, did you do any review of either the history of how Tennessee's early protocols were carried out in earlier executions?
A. I didn't review them on my own. I did, of course, review some of the references to them in the testimony. Specifically, regarding Mr. Coe, it was referenced in the testimony. I can't recall, honestly, if there are any others, but that was certainly one that was referenced.
Q. Did you recall the manner in which protocols in other states have been carried out or any failings along those lines?
A. That was presented in the case, in your case presentation, and was referred to by several of the witnesses on both sides regarding executions in a variety of other states, Florida, North Carolina, California, to name just a few.
Q. Have you ever been asked in any prior proceeding to offer an opinion regarding the Tennessee Lethal Injection Protocols?
A. No.

Q. What were you asked to do in this case?

A. The judge had asked that I review the protocol and be prepared to answer -- and the testimony regarding the protocol and be prepared to answer your questions about that.

I did, in doing so, took the latitude in reviewing the protocol, as I guess physicians want to do, in finding things that are potentially problematic and try to identify areas there that, hopefully, I would be prepared to answer questions. And of course, those are areas that have already been addressed in some of the testimony on both sides.

Q. As regarding the opinion of Dr. Mark Dershwitz, do you see areas of his testimony which you considered to be particularly strong and reliable?

A. Well, I have to -- and I can refer to it. But in general to characterize his testimony, it was about the pharmacokinetics of Thiopental. And of course, he did refer to other aspects of the protocols, but a lot of the discussion was regarding that

particular topic.

And I think, as it was identified in the questioning, the references and the standards in which he'd used in terms of the software, for example, that he would use as a standard software. And so I would consider that to be reliable in that regard in terms of supporting the comments that he was making in regard to plasma levels and probabilities of consciousness related to those plasma levels. So those were certainly, I think, would be standard observations

Q. And did you note any particular weaknesses in his opinions?

A. I think it's been pointed out in some of the other testimony, you know, the results that he presented are models, not actual measurements, if you will. They're predictions. And of course, all models have assumptions that they're based upon.

And the assumptions in those models could potentially differ since they're derived around the normal care for patients in a surgical and anesthetic setting. Those conditions may vary from what may be

encountered in the lethal injection environment. Particularly, just one example was referenced by Dr. Lubarsky, for example, that inmates are not ventilating and therefore have a risk of becoming acidotic. In normal clinical conditions, that's not something we encounter in the normal course of anesthesia induction. It's just sort of one example.

There are, again, assumptions that may -- that those models are based upon. It may be different from the actual conditions in which you're encountering in a situation.

Q. Regarding the opinion of Dr. Lubarsky, did you find aspects of that opinion to be particularly strong?

A. Well, the comments he made specifically on this topic related to the protocols and some of the potential -- or problems that have been reported regarding carrying out those protocols, I thought, were informative and spoke to the general nature of performing this procedure under the conditions in which it's performed, the personnel under which it's performed.

So that was, I thought, fairly well substantiated, at least to the materials that I reviewed.

Q. Did you find aspects of Dr. Lubarsky's opinion which you considered to be particularly weak?

A. I don't know if I would say weak. But I think, you know, both Dr. Lubarsky and Dershwitz spoke about sort of their coming at this problem of trying to ascertain the probability of unconsciousness and the plasma levels of thiopental that would produce a high probability of unconsciousness at the time of the administration of Pancuronium.

And they came out from a different way. And Dr. Dershwitz, again, through modeling based upon assumptions, but using standard methods to predict what plasma levels would be. And then Dr. Lubarsky, based upon measurements of actual plasma levels, the weakness with -- let's say the non-ideal circumstances under which he was presenting his data was that most of the samples were taken at variable times and under variable conditions from variable

sources.

If you were actually studying this, you wouldn't design it that way, because there's a lot of variability that affects the results in your prediction.

So with regard to Dr. Lubarsky's presentation, again, trying to get at the problem, I was just identifying -- or a solution for the problem I was trying to identify, that's certainly weakness in that presentation. One, of course, they acknowledge.

And then in the discussion, there is clearly a difference of opinion. And this is one area that I'm not necessarily an expert, which is what happens to plasma levels of Thiopental postmortem. So there's some difference of opinion about -- and again, both using reasonable scientific methods to make their predictions, but there's a difference in opinion about how that would occur. In other words, would the plasma levels increase or decrease postmortem.

And so I think that's one of the areas of real controversy here.

Q. Did you also consider the deposition testimony of Dr. Levey?
A. I did.
Q. And did you find any particular portions of his testimony to be particularly reliable?
A. Well, part of his testimony, I should probably refute again, but he spoke a lot about the postmortem results from the Coe execution. And of course, I think he accurately presented the data that he'd received and spoke about, some of the changes that would take place with plasma levels, for example.
And so he represented that, I think, quite accurately. And he also was asked some questions about some procedural issues which he acknowledged he wasn't an expert in, and I think that was a fair representation.
Q. I don't want to cut you off. I'm sorry.
A. No. I was going to say if you wanted me to, I could go through that review again, but that's sort of recalling it off the top of head. And obviously, if you have areas,

Case 3:06-cv-01206 Document 130 Filed 09/05/07 Page 14 of 60 PageID #: 3153

I'd be happy to respond to those particular areas of that testimony.
Q. Again, with Dr. Levey, did you find aspects of his testimony to be perhaps weak or not as strong?
A. I couldn't comment off the top of my head. Again, I'd like to review again, if I could, to make those comments.
Q. If that helps you.
A. I didn't really do a sort of pro or con. We can dig this one out here.
THE WITNESS: It's the smaller one.
THE COURT: Yes.
Let me just say that I think Dr. Higgins is at a little bit of a disadvantage with these extremely open-ended questions. I anticipated that you all would be focusing in with, well, what do you think about this, and what do you think about this, and what do you think about this. I think this is a very difficult way to be examining him, and I don't think it's very fair.
And I certainly don't want to examine him myself, but I anticipated very specific

questioning about what he thought about things presented by the various experts. And I'm just feeling uncomfortable for him, because you're asking him -- he's reviewed, you know, 10 inches of material.

So to the extent you all can be a little more specific, I think it would be fair to him.

MR. KISSINGER: And I could do that. I was just tying to leave him a little bit of leeway there. So I guess I didn't look at it from that aspect.

THE WITNESS: So I guess to answer your question, I didn't find any particular aspects of his testimony that were concerning with regard to validity or accuracy, at least the best that I can assess it, if that's what you're looking for.

BY MR. KISSINGER:

Q. Dr. Higgins, if I could return to your testimony about Dr. Dershwitz.

A. Right.

Q. You mentioned that the program that he used was something which was commonly accepted in the field.

Are you referring to the stand pump program?
A. Correct.
Q. Am I correct that the stand pump is something that exists in the public domain?
A. That's right.
Q. And my understanding of that particular program is that the only way that has been allowed to remain in the public domain is its creator or to acknowledge that it was experimental and not reliable for use on human beings, that that was a requirement that the FDA provided; is that correct?
A. I'm not aware of those conditions. I mean, that would make some sense. Given what you've just said, I'm not aware of that.
Q. I want to talk again about sticking with Dr. Dershwitz's deposition.
A. Right.
Q. Do you consider that the postmortem deposition figures that he relied upon in terms of supporting his theory of postmortem redistribution of sodium thiopental to be -- well, the use of those to be scientifically appropriate?

A. I really -- I guess maybe you can be more specific about the exact values you're referring to, because he did refer to several -- you're taking about plasma levels that were measured?
Q. Yes.
A. If you could refer me to a specific area of his testimony, I'd be happy to try and comment on that.
Do you recall what page?
Q. I do not. However, maybe if I present it in a form of a hypothetical --
A. Okay.
Q. -- you can help me kind of get to where I'm going.
A. Uh-huh.
Q. During_his deposition, Dr. Dershwitz referred to a series of five executions which had been performed -- no. Six executions; four in North Carolina, one in Connecticut, and one in Montana, where postmortem thiopental levels had been determined from samples taken immediately after the execution and then at varying times removed from the execution.

Case 3:06-cv-01206 Document 130 Filed 09/05/07 Page 18 of 60 PageID #: 3157

A. Correct.
Q. He acknowledged, I believe, that the blood samples were taken from different sites as well as from varying times, yet offered those as support for his theory that postmortem thiopental levels decrease as oppose to increase.
Is that type of data reliable? Is that a reliable basis for offering the kind of opinions that Dr. Dershwitz drew from it?
THE COURT: You're thumbing through there. Let me tell you to look at 119. I think 119 to 121 is where he talks about that.
THE WITNESS: Great. Thank you.
Well, I guess the comment about that was sort of -- and Dr. Dershwitz acknowledged that from different sites you will get varying values; if it's from an arterial site versus a venous site, if you get it from a peripheral versus a central site.
And that is a little bit -- creates some problems in the interpretation. Again, it would be non-ideal to draw conclusions from it. Be it as it may, he's given those

assumptions. He is drawing the best conclusions he can based upon the data he has.

I'm not necessarily an expert in pharmacologic research, so I couldn't say this is the site you need to take it from. Although, there certainly are recommendations depending on, of course, what you're trying to determine. The main issue being that you want to be consistent about it, and that's both in terms of the time course of the samples and the location in which you're drawing those samples, and of course, the analytic methods, but that's assumed to be standard.

So any aberration or deviation from that kind of a design would weaken the assumptions or the conclusions you might draw from that. To the extent -- I can't really comment on the extent that this particular sampling would affect the conclusions in terms of the extent, but it certainly would be considered non-ideal even in those cases.

BY MR. KISSINGER:

Q. Dr. Higgins, would it be fair to say

that, whether we're talking about Dr. Lubarsky or whether we're talking about Dr. Dershwitz, that these non-ideal situations regarding postmortem distribution tend to, perhaps, undercut both of their opinions to the extent that we really don't know which one of them are correct?

A. I think that's a fair statement. And I sort of try to point out that they're both dealing in non-ideal circumstances. And I think even Dr. Lubarsky commented on the ideal way to approach this is really do it in a prospective way in terms of study, in terms of actually being able to measure values and to do that. I think he had commented on that.

Of course, that would be ideal. I don't know in a practical matter if that is. There clearly has been some attempt to do that given that Dr. Dershwitz did report on some time sequence values that were obtained.

But again, just to point out the problems there, you know, they were using different dosages, I think, in some of the municipalities. And then time course of the

administration affects the peak levels and the decrease in those levels.

So there are a lot of factors that were not controlled here. So I think they both would say, yeah, their assumptions are based on non-ideal circumstances, and there are ways they might address it prospectively.

Q. In terms of the opinions offered by James Ramsey, would you agree that a percentage concentration of approximately 16.4 mEq, I believe, per liter is required to stop the heart?

A. I haven't seen that figure. I honestly can't confirm that, that exact number, no. I doubt it, honestly, it's a valid number, but I couldn't say either way since I haven't seen a study to support it.

Q. Are you familiar with the concentration, or the concentrations used to stop the heart -- the concentrations of potassium used to stop the heart in a surgical setting?

A. You're referring specifically to cardiac surgery.

Q. Yes.

A. We generally try to avoid that situation in other procedures.

Actually in terms of the concentration, no. So I'm not sure exactly what they're using currently in the concentrations in the cardioplegia solution which is what you're referring to.

Maybe just sort of a comment on that specifically, that specific issue, because I think the comment was since this is what we use in cardiac surgery, I think the train of thought went that this is what must be achieved to stop the heart in other circumstances.

And I would say that's not necessarily an accurate conclusion, because in cardiac surgery the objectives are a little different. You're trying to instantly to rapidly stop the heart and actually -- because what you're trying to do is reduce the metabolic consumption of the heart. So you want it to happen as quickly as possible. So obviously, restarting it is the way we reduce the chance of ischemia. So it's easier to restart the heart.

So your objective is a little different in that situation. So the assertion that way, you can't stop the heart with lower concentrations or doses. And the plasma less than 16.4 mEq, I don't think is correct.

And I guess, anecdotally, I would offer as evidence to that is the fact that the literature is replete of circumstances in which cardiac arrest has occurred with smaller doses being administered than we use either in probably cardioplegia or certainly would be used in this protocol.

And that's been reported. I have personally reviewed cases in which patients have had arrest with 40 mEq or less being administered rather than 200, for example, that's in the protocol.

Again, those are under patient conditions. So the circumstances are a little bit different in terms of those situations, but I have certainly seen it in smaller doses.

Q. In terms of these cases where you have observed the heart being stopped with doses

of 40 mEq, how are those 40 mEq administered?
A. Intravenously.
Q. And do you know where intravenously? Is it in the arm?
A. Well, the cases that I've reviewed, I'd have to say for the most part they were done through central lines. They were administered through central lines. So venously, but through a central access.
Because in general, these are mistakes in normal administration protocols. In normal administration protocols, we generally try to avoid administration of peripheral I.V.s because of potassium, and sclerosis, veins, and it's also uncomfortable. So if you're doing it in an awake patient, you certainly wouldn't want to administer it that way.
So most of the situations that arise are necessarily then, therefore, through central lines.
Q. In these instances, did the potassium stop the heart, for want of a better expression, permanently?
A. No. In the cases I've reviewed.

Case 3:06-cv-01206 Document 130 Filed 09/05/07 Page 25 of 60 PageID #: 3164

That's what you're referring to specifically, the cases I reviewed, right?
Q. Specifically, yes.
A. I've obviously been aware of deaths have occurred. When reports are in the literature or in the paper, that's usually the outcome. But in the cases I reviewed, fortunately, the patients have been resuscitated.
Q. Is there a difference between cardiac anesthesiology? Is that a specialized branch?
A. It's a subspecialty, correct. So I don't practice cardiac anesthesiology. I can't tell you exactly how we're dosing the cardioplegia today. Certainly, that's not a difficult number to ascertain.
Q. Prior to rendering your opinion at the trial in this matter, will you be determining the dosage used to stop the heart in a, for example, cardiac surgery setting?
A. I'm sorry. Ask the question again.
THE COURT: You're building in an assumption that I think is a false assumption.

His testimony that he's giving today is what is going to help the Court. I'm going to use his testimony today to help me in my decision.

And he has reserved the afternoon of next Friday to come back to give further testimony if anybody decides they want to have that testimony.

So he's not firmly scheduled to come and testify at the hearing.

MR. KISSINGER: Okay.

THE WITNESS: But if I do, I can find that out for you.

MR. KISSINGER: Well, that would be great.

THE COURT: Ask that again so we all understand exactly what you've asked him to come with.

BY MR. KISSINGER:

Q. Dr. Higgins, if you do testify on this upcoming Friday, if you could inquire from perhaps a cardiac anesthesiologist there at Vanderbilt or someone else with knowledge to what concentrations they're using to stop the heart for cardiac surgery.

A. I'd be happy to.
Q. You mentioned that you looked at Dr. Lubarsky's deposition, particularly, in light of some of the problems he identified in terms of how execution protocols are carried out.
Do you consider the use of Emergency Medical Technicians/paramedics to insert the I.V. into the condemned person, or to insert the catheter actually to pose a substantial risk of error?
A. Well, I'm not specifically familiar with the training and practice of EMTs and paramedics, but if I could sort of speak in a general term in that regard.
Anyone who has received training in the expertise of placing and troubleshooting I.V. catheters would certainly be appropriate to do that.
For example, in hospitals, we have a lot of I.V. therapists that perform actually the vast majority of I.V. placements, and they're trained specifically to do that task and carry it out well.
So I can't comment specifically. My

guess is -- it's not a guess. I realize that EMTs in the field and paramedics do place I.V.s for resuscitation purposes. And my observation is in receiving those patients that, in general, they do a good job in carrying out that task.

I'd have to say from my experience, yeah, they would be probably adequately trained to perform that task.

Q. In your experience, do problems in the insertion of intravenous lines or catheters occur -- is it predictable that those kind of errors would occur?

A. Well, they certainly do occur. They occur every day. And I think maybe part of the question is to, you know, are there means to troubleshoot and determine if there's a non-functioning I.V. before we use it for drug administration. And there are. We use some those methods. Actually some are described in this protocol which is, for example, looking at the drip rate, free flow rate, and seeing if blood returns or comes back into the line or could be withdrawn from the line. Those are two of the techniques

Case 3:06-cv-01206 Document 130 Filed 09/05/07 Page 29 of 60 PageID #: 3168

amongst which there are others that we use.

Others would include examination of the site, injection site, by palpation and visually determine if there's an infiltration or signs of infiltration or temperature change, et cetera, that would be consistent with infiltrations.

So there are a variety of techniques used to determined that. But yes, I.V.s certainly do malfunction. As a matter of fact, I was in the operating room yesterday and I had one malfunction in the middle of inducing a patient. They do occur.

Q. And what kind of skill level is required to detect those kind of problems?

A. Well, that's a good question.

Certainly, hopefully, anyone who's trained in the regular practice of placing the I.V. catheters has also been trained to troubleshoot them. So in that case, I.V. therapists and nurses, many of whom are to receive some more training, would be allowed to -- or have the skills to determine whether they're functional or not.

My opinion, I'm somewhat biased,

obviously, I think anesthesiologists because we are very expert in placement of I.V.s and also in using them. Under a variety of circumstances, they're probably the best oftentimes in determining whether you have a functioning I.V. But I am a little biased.

Q. Assuming for the purpose of my question that an anesthesiologist is not available.

Would you agree that the person whose role it is to detect errors in the insertion of the I.V. should be a person who not only has sufficient skill and training in its insertion, but also day-to-day experience in the insertion of I.V.s and the detection of errors?

A. Well, I think that's fair to say, not only the day-to-day experience in insertion, but also in using it for administration. Because that's clearly what you're trying to ascertain here.

So you want to be able to, again, do the things that I just mentioned in terms of troubleshooting actively during the administration process. So those two skill

sets are important.

Q. Having examined Tennessee's new protocol, are you aware that Tennessee removes the EMT/paramedic trained people from the execution room?

A. Yes.

Q. Or the execution chamber immediately after the I.V.s are inserted?

A. Yes.

Q. And are you aware that no person remains in the execution chamber who has any training even in the insertion of I.V.s?

A. Yes.

Q. Are you aware that the person who pushes the drug into the condemned inmate, at most, has a 32-hour class in the insertion of I.V.s and no training from a medical professional in the pushing of drugs into an I.V. line?

A. I actually wasn't aware of that fact.

THE COURT: Do you want him to look at the protocol?

THE WITNESS: I can do that. I have it here.

MR. KISSINGER: We got it out of

the depositions, Your Honor, of confidential. This is information that we got out of the depositions.

THE COURT: Not in the protocol.

MR. KISSINGER: Right.

THE WITNESS: I thought the protocol referred to EMTs or others administering that. But again, I would like to look at it to be certain.

They certainly place the lines in the protocol. I'm not sure actually what the training is of the administration. I could refer to what's in the protocol if you'd like me to and comment about that.

BY MR. KISSINGER:

Q. Again, these questions are more to how Tennessee carries out the protocol as oppose to what they write down on paper.

A. Okay. If that were the case and if you asked me to comment, I would consider that problematic given what I just described in terms of skill set that's required. So under those circumstances, that would be a problem.

Q. When you say problematic, are you

Case 3:06-cv-01206 Document 130 Filed 09/05/07 Page 33 of 60 PageID #: 3172

saying that this practice creates an unnecessary risk of error?

A. I don't know about unnecessary, but it does -- you all have to determine that, but it certainly does create a risk for errors.

If someone isn't used to -- well, A, the conditions you described in terms of not being able to examine the site directly, and as I described, palpating, sensing, doing that during injection, there is some risk that you would have an infiltration and not detect it.

If someone is not trained in injecting medications through an I.V., there are some risks, because you have to be able to sense the resistance in the system and understand how that's related to the length of the I.V. and the size of the syringe that you're injecting through. And a lot of that is, frankly, just experience. You can't really describe that to someone and have them innately understand and develop that skill. So there is some experience required to do that well.

Q. When you refer to experience, are you

referring to experience with someone present -- with a knowledgeable person providing an instruction or simply the administrator injecting, for example, saline through an I.V?

A. I'm referring to the experience specifically being in the actual act of administration, not being able to instruct. Because what I'm talking about are tactile things that you can't tell someone about. They have to have the experience themselves.

Q. And in determining what they're learning through experience in teaching them the correct way or simply their repeating the same problem, or their repeating the same improper administration over and over again, what kind of training does that require?

A. Well, I can just give you an example of what we do. I can't necessarily describe what's required throughout medicine.

But in anesthesiology, we require, for example, in training resident physicians and nurse anesthetists, which we do, I know we require certain experience in terms of number of cases for them to perform. Of course,

we're looking at a whole host of other learning objectives other than simply administration of drugs.

For example, we ask people to -- or expect people to perform somewhere between 600 and 1,000 cases a year in over three years, of course, to become an expert in this. And that's our standard is to be the expert. So that's just sort of, I guess, an extreme example, but an example of what it would be to be an expert at that level.

I certainly think you can achieve a level of competency with less experience than that. But again, I'm not specifically familiar with the training of any, for example, nurses who do administer medications intravenously on the floors in hospitals, what their requirements are. But they have certainly achieved a level of competency and done it in a different way than what I just described to you.

But there certainly needs to be a number of administrations that they would perform in order to be able to have enough of these complications occur, honestly, so that

they could get that experience for themselves, and then, also, troubleshoot them and learn how to avoid them.

I'm sorry I can't give you an exact number. But the number is certainly more than 50, and it's certainly less than probably 1,000. But that's just sort of in some way speculation.

Q. If during the course of this training the persons we're talking about had not encountered any troubles or any problems in pushing the drugs, would a person under those circumstances, assuming they don't have a day-to-day clinical background, would a person who had undergone that kind of training in an informal setting with experiencing no problems, would they be adequately trained to detect the problems that could occur during the pushing of the drugs?

A. I'm going to ask for clarification here. You're asking if someone in their training experience hasn't encountered any problems or toubles would that be considered adequate.

Q. Right.
A. I'd say no.
Q. After catheters have been inserted, what kind of problems can arise in the administration of drugs?
A. I think a few are identified in the testimony. Once a catheter is inserted, the fact of the matter is, it can move. So we haven't sort of discussed this. So just the fact that it's confirmed at one point in time doesn't mean that it's necessarily still in the correct place in terms of being in the vein.
You can get, if you will, both false positive tests in terms of being adequately placed, but also they can just move. For example, I reference the case of a patient I was taking care of yesterday. Their I.V. worked until in the middle of the administration. It stopped. It was certainly working adequately before that. So things will change.
Some of the things that cause that are the actual administration of drugs themselves. They can cause veins to change

in size and catheters to move if a high pressure is administered. And so, then, they can move from within the vessel to outside the vessel.

In the actual administration of drugs, there are a few problems, I think, which were alluded to in the testimony. One is that you use a Stop Cock incorrectly. It seems simple, but I've seen the mistake occur all the time even with well-trained individuals. And when they're anxious or in a hurry and they'll turn it the wrong way and inject -- what they're trying to inject into the patient into the I.V. bag. It goes the wrong direction.

You can also -- and this is a particular issue in this situation, but again, we use these drugs. You can administer those two drugs together. In a case of Thiopental and Pancuronium, they'll actually precipitate in the I.V. or in the line, the tubing, which, obviously, is a problem. It will stop function.

So given the drugs in close cessation and together can cause those kinds of

Case 3:06-cv-01206 Document 130 Filed 09/05/07 Page 39 of 60 PageID #: 3178

problems in particular.

Q. Again, looking at simply the kinds of problems, kind of separating the prior discussion we had in terms of the administration of drugs.

A. Okay.

Q. Just looking at the kind of problems that come up in terms of just maintaining an I.V. line in everyday basis, are those kind of problems -- I believe you mentioned a slip or a move or those kinds of things -- are those problems common enough that they could be described as predictable?

A. Well, those are two different -- they're two different circumstances. They are common enough to say that they will happen. To predict the circumstance in which they will likely happen is a little more challenging.

So you can predict to a certain extent a high likelihood. Just an example, again, a patient I took care of yesterday had an I.V. placed in the antecubital fossa where the arm normally bends, and that patient bent his arm and the catheter kinked and stopped working.

So therefore, we generally discourage the placement of I.V. catheters in the antecubital fossa because -- I'm sorry. The antecubital fossa is this area of the arm. With movement, they're more prone to kink it. So I would say you can predict in that circumstance they'd have a higher likelihood of not functioning. Other I.V.s that stop functioning, it's not entirely predictable.

So I hope that answers the question. So yes, they do stop functioning. You can't always tell when that's more likely to occur than not.

Q. But would it be fair to say that we can predict that errors will occur after the I.V.s are inserted?

A. Yes.

Q. And looking back at our skill level, if the person responsible for observing the injection site where the catheter inserts in the arm has no training at all and is observing via a camera, closed-circuit camera, does that person have the requisite skill to detect the type of problems you described?

A. The skill or the ability, I think, would both be compromised for the reasons I mentioned.

I mean, visual observation is certainly better than none, but you can't sense some of the more subtle changes that really require tactile monitoring during injection.

And again, these are relative levels of veracity or detection, but the highest level would be to actually be able to physically monitor the injection site during the injection processes with your hand on the site, which is what I do every time I induce a patient. Because that's the best method.

Q. Would it be fair to say that this type of detection can't be done simply by looking at the injection site and concluding that there was no swelling and that that's the criteria that's used?

A. It would be hard visually to have the highest level of confidence about that. So I hope that answers the question.

You can, certainly, if you can look very closely, certainly see changes with most

infiltrating I.V.s, but not all.

An example, in a hand, it's very easy to see changes because the skin is very thin and there are not really any tissues there, or thick tissues. So it's pretty easy to see an infiltration visually.

In other aspects of the arm or in someone who's obese, for example, they can be very problematic, because there are a lot of soft tissues there and you can't deposit a fair amount of fluid through infiltrating an I.V. without being able to visually see that.

So it depends on the patient a little bit. But yeah, again, the idea is not a visual confirmation. It's actual physical contact.

Q. In my prior example, we talked about the person who is making this observation having no training whatsoever.

If we assume that this person had a one-week course in inserting catheters in 1998 and had had only a four-hour course, I believe, since that, if that were the person who's responsible for making the observations, would you still say that this

type of visual observation is not adequate to detect the kind of errors in administration?

A. I assume that those assumptions have minimal training and remote -- I'm just referring to the circumstance. But under that specific assumption, I'd say that would not be adequate.

Q. In reviewing the material, I believe you said earlier that you looked at the problems with California executions, or some of the problems that had arisen in executions in California; is that correct?

A. There was a case reference there that I read.

Q. Were you aware that California also used five grams of sodium Thiopental administered in four 1.25 gram doses?

A. Yes.

Q. Were you aware of the reports from California that patients were seen breathing many minutes after the administration of the sodium Thiopental?

A. Yes.

Q. Are those observations consistent with Dr. Dershwitz's opinion that a patient would

be rendered -- that with the administration of five grams of sodium Thiopental, that a patient would be rendered not only unconscious, but unable to breathe within a period of time much shorter than when these observations were made?

A. Yeah. I think that would obviously be problematic. I was surprised by that report given that a five-gram administration is ten times what we would give to a normal sized and normal patient for induction of anesthesia. And that, of course, in my experience, renders virtually everyone apneic, stop breathing.

So I was surprised to see that report in the California case. Of course, we don't know the details of the actual protocol; was it followed. It does make you wonder if the actual drug was totally administered to the patient completely intravenously. It raises some concern there.

And assuming that it was, clearly, that would not be consistent with the observations that Dr. Dershwitz had referred to with regard to being apneic.

And as you point out, of course, there's a difference between stopping breathing and being unconscious. People can certainly be unconscious and breathe. People could be conscious and not breathe. It's a little complicated.

But in this particular circumstance, it does raise some concern that someone is still breathing at that high of a dose, that there could potentially be an increased risk of consciousness at that particular time.

Q. Assuming that what was observed during these executions was not breathing, but, in fact, involuntary muscle movement following the administration of the sodium Thiopental, if those movements were to continue even after the administration of the Pancuronium Bromide, would that indicate to you that the effects of the sodium Thiopental had adversely affected the effectiveness of the Pancuronium Bromide?

A. What it actually leads me to be concerned about is to whether or not the I.V. was working. Because Pancuronium Bromide, again, in the dosages that are administered

Case 3:06-cv-01206 Document 130 Filed 09/05/07 Page 46 of 60 PageID #: 3185

in that protocol would very rapidly result in apnea. So again, it depends on the time course, which is what we're talking about here and we don't have, unfortunately, the details.

But under the assumption that someone was breathing or moving, let's say, after the administration of Pancuronium Bromide, I would say that drug was not administered properly.

Now, in regards to the two drugs interacting, which is the other issue, the precipitation that might occur if the two drugs are inadvertently mixed together, the precipitant is actually Thiopental.

So in theory -- and again, this hasn't been tested. But in theory, the Pancuronium is just fine and would work under those circumstances if the two were inadvertently mixed together, whether it was in the vein or an I.V. I think that addresses a little bit of the other issue.

So in my mind, it's not that the Pancuronium interacted with the Thiopental, but that neither adequately was administered

into the venous system in that circumstance.

Q. I believe that Dr. Dershwitz testified that five grams would also cause the heart to cease.

If that were the case -- this may be a little open-ended -- how would the Pancuronium Bromide be transported from the vein to, I guess, the brain?

A. Well, the Pancuronium Bromide doesn't affect -- you know, it effects the site of action. It's not in the brain in particular. The Pancuronium is working at the neuromuscular junction.

But the point is -- the question is still the same, which is how does any drug get to its site of action if there's no circulation. So your question, they would -- if there is no circulation, of course, if would not. If the circulation were severely depressed, it would, but it would take a longer period of time to get there.

Again, the circumstance you're describing, if the Thiopental were administered and there was a significant inhibition of the circulation, then one other

possible mechanism by which the Pancuronium would not work would be the fact that it hadn't achieved its site of -- distribution to the site of action. So that certainly could have been the case.

But going back to the prior point, I was surprised to know that the five-gram administration of Thiopental didn't result in, first, the cessation of breathing or even a cessation of voluntary movement, which would be very unusual under that circumstance.

Q. You mention that you suspected that this phenomenon was the result of improper administration.

If indeed this phenomenon had been observed in a number of executions, would that cause you concern that there might be another mechanism at work that's preventing the sodium Thiopental from working in the way that, for example, Dr. Dershwitz would predict?

A. I can't think of any other explanations. You certainly would have to be open to a variety of plausible explanations.

Again, I can't think of any on my own at this particular point in time. I would mainly suspect that it's either not reaching the site of action, or for whatever other reason, it's not effective at its site of action, if what you described in terms of the response in Thiopental or the movement under Thiopental was occurring in repeated incidents.

The other example you gave us was the Pancuronium, and I think that was a little special circumstance. Were you asking specifically about Thiopental?

Q. Right.

A. Okay. So I would suspect that it's probably just not reaching the site of action or it's not effective at the site of action.

One of the conditions that I mentioned earlier and one that Dr. Lubarsky referred to was, in the circumstances of acidosis, you may have, potentially have, a different pharmacodynamic response.

That's speculation. I honestly couldn't validate that. But conjecture like that could -- or a hypothesis like that could

be advanced and tested with regard to the observation, to support the observations that you just described.

Q. Under those circumstances, Dr. Higgins, would you agree that we are looking at the situation where we know something went wrong and we're not sure what caused it?

A. Right. I think that's a fair conclusion.

Q. And would you also agree that whatever is going wrong, if it's going on in a repeated kind of basis, that this is something you would describe as problematic?

A. Given the objectives of the protocol, I would say yes, it's problematic. These assumptions are once again -- you're trying to guarantee unconsciousness at the time of the Pancuronium administration -- I think that's actually the primary issue -- then I would say yes, this would be problematic, especially if it were repeated.

But even in a single incidence, it would make you observe. That's something we share oftentimes just in terms of case reports in medicine. It's meant to be

distributed, and that's why it's published. We ask that people take note, and we try to get other additional information that would then be used to form a hypothesis and perform a study.

I would say even in a single incidence if we don't understand it, it's probably worth investigating given the issues that you're dealing with here.

Q. Were you aware of a California execution where the condemned man had to be given a second dose of the potassium chloride?

A. Uh-huh. It was reported in the testimony. I'm not sure whose testimony, but I do recall reading that.

Q. Are you aware that Dr. Dershwitz advised the committee that it was his opinion that this was required, that the second dose of potassium chloride was required, because the sodium Thiopental had interfered with the circulation?

A. Yes. I do recall that.

Q. Would you consider that to be problematic to the extent that Tennessee also

uses the five-gram protocol and Dr. Dershwitz's statement that the use of five grams is interfering with the distribution of the other drugs to such an extent that it interferes with their effectiveness?
A. Again, problematic in terms of achieving what outcome?
If the outcome and the desire is to have a very rapid stoppage of the heart, then, you know, for the reasons you just described and Dr. Dershwitz detailed, anything that impairs the circulation reduces the ability of the potassium to get the effective site in appropriate concentration in time course to effect the cessational electrical activity.
So if the desire is to do that predictably and quickly, that's certainly going to be impaired by any decrease in circulation.
Q. Are you familiar with the peer review process?
A. Yes. I'm in charge of the peer review process in our department.
Q. So you're pretty familiar with it.

A. Yes.
Q. What's the purpose of peer review?
A. The purpose of peer review is to -- well, there are multi-fold purposes. But the primary purpose, from my perspective, is to gather a group of peers who can assess the events and circumstances surrounding events that either had a poor outcome or were considered near misses, that is risks of having a poor outcome, and to learn from those and attempt to improve our practice, implement changes in our practice to avoid those types of circumstances or incidents in the future.
Q. In terms of the peer review of articles and treatises, would we be looking at the same thing?
A. Oh. I'm sorry. I was thinking of peer review in terms of morality review. I'm sorry. You're talking about peer review in terms of authorship and journals. Yes, absolutely familiar with the peer review process there.
And clearly, the purpose there is to have a panel of experts familiar with the

Case 3:06-cv-01206 Document 130 Filed 09/05/07 Page 54 of 60 PageID #: 3193

specific topic, area of review, the research, which is usually what is being submitted for publication, and ascertain the value of the conclusions to the literature, as well as validity of the methods and the appropriateness of the conclusions drawn from the data in the study.

Q. Would you agree that peer review enhances the reliability of the published material?

A. Absolutely.

MR. KISSINGER: I don't believe I have any further questions at this time.

THE COURT: Okay.

QUESTIONS BY MR. HUDSON:

Q. Dr. Higgins, my name is Mark Hudson. I'm representing the State, if you will, in this action.

I think there's been testimony in the depositions, and particularly of Dr. Dershwitz and Dr. Levey, regarding the effects of the administration of higher doses or doses higher than the therapeutic doses of Thiopental. And I wanted to know, if after

having reviewed their comments, if you agree with their assessment of the effects of Thiopental.

Say, for instance, in Dr. Dershwitz's deposition, he described the effects of 1.25 grams of Thiopental, what effect that would have.

Do you agree with his assessment?

A. If you have a particular reference.

THE COURT: Yes. Give him the page number.

MR. HUDSON: It's on Page 95.

THE WITNESS: The question was the physiologic effects which occurred during the second administration of, in this case, the second 1.25 gram?

MR. HUDSON: I'm sorry.

THE COURT: 91, maybe?

MR. HUDSON: Yes. I'm sorry. I jumped ahead.

BY MR. HUDSON:

Q. Page 90.

A. The physiologic effects of the injection of the first 1.25 grams, and his comment was the person will probably lose

consciousness after the delivery of approximately one to 200 milligrams. And it's typical, a person will lose consciousness.

And I would agree, of course, with that conclusion.

He also commented on Page 91 that acidosis increased from that, that there would be an effect on cardiac contractility and blood pressure which would fall reducing the circulation. And I would agree that that would also occur and be significant, again, with a larger than standard dose that we would use in practice. But those even occur in the dosage ranges that we use in practice.

I don't know if he makes a comment here on respiration, but there certainly would be an effect on respiration as well in terms of general resulting in the cessation of respiration at that dosage.

Q. If a person was given a 1.25 gram dose of Thiopental intravenously, how long would that keep them unconscious, or what would be the duration of their unconsciousness?

A. Several minutes. Again, this all has

to do with how certain do you want to be. And the longer you wait, or the longer you take, the longer, of course, the chances are that the drug will redistribute and they'll become conscious again.

Sort of a side comment, that's in the circumstances in which we're sustaining normal functions in a patient. For example, we're ventilating that patient. In the case of an inmate where you're not providing that support, they would obviously become, if they're not breathing, which assuming most people would stop breathing with this dose being administered, they would become hypoxic. Oxygen concentration would drop in the blood and eventually the oxygen delivery to their brain and heart would also drop.

So that would have a different effect than would be different than normal circumstances.

Q. And that's at the 1.25 gram level?

A. Correct.

Q. That you said the heart would -- they'd stop breathing?

A. Correct, for the majority of people.

So again, talking about the time course of the effect, if the effect is unconsciousness, there's an effect caused by the drug that causes unconsciousness. But there's also an effect of hypoxemia or anoxia unconsciousness that you're aware of.

So conscious may never be regained no matter what the redistribution time is for the drug under that circumstance.

Q. And that's with the 1.25 dose?

A. Correct.

Q. Would you also agree with this comment with regard to the addition of another 1.25 gram dose, which I believe -- now, that is dealt with beginning on Page 95.

A. So he commented that it's just an extension of the same effects that occur after the first. And the correction here is that EEG activity would likely drop. So the electrical activity of the brain would decrease and essentially become what we call flat line here. So that would certainly -- I agree that that would occur in the vast majority of individuals.

And then he also commented that the

Case 3:06-cv-01206 Document 130 Filed 09/05/07 Page 59 of 60 PageID #: 3198

period of apnea would also extend, which would be true as well. He was asked about the cardiac function in terms of decreases in arterial pressure that would occur with an additional dose such as that. And I would agree that that would certainly also extend and would be at low levels. So I agree that his description of the effects of the subsequent dose would be accurate.

Now, the caveat there is I've never administered doses like this in my own experience. There are a few physicians that have. Under only special circumstances do we do this in terms of trying to protect brain function. So there are anesthesiologists who might actually use the protocol such as this. And I believe that's what Dr. Dershwitz was referring to, the circumstance in which he's administered those drugs.

So I personally have never administered at that level, but I certainly think it's reasonable to predict that those effects would occur as he has described them.

Q. Is there a dose of Thiopental that is considered to be lethal?