A. Yes.

Q. What is that?

A. We don't know. I don't mean to be cagey, but the answer is, of course, absolutely. If you administer enough Thiopental to any individual, they will die. And even probably with support, they would die.

Again, that's what a lot of this discussion is about, is trying to reliably predict what that dose is that achieves those concentrations, plasma concentration, that has a high probability of death, and certainly, unconsciousness in the case, but then also death.

So the answer is yes. I couldn't tell you exactly what that is. I mean, I could give you a large number and say absolutely that will guarantee it in every person on this earth but perhaps one. I couldn't tell you what that threshold is.

I'm not trying to be -- so I couldn't tell you if it was 10 5 grams or 10 grams or 15 grams or 20 grams. Certainly, there is a number at which everyone would certainly die.

Q. Could you say that in the instance that Tennessee is using five grams of Thiopental, would that be a lethal dose for someone who is not supported in any way?
A. It should be. The only concern I have is the case that was referenced in California in which someone was still breathing.
Again, I'm concerned that that actually -- that situation describes the administration, a successful administration of the drug. So again, if you have successful administration intravenously of five grams, I would say that virtually all people, the vast majority of people, would die.
Q. Referring to that California example, are you aware of any factors that might come into play as far as the movement of the inmate and attributing that movement to breathing?
Will the body react to the administration of Thiopental in such a way that it might appear that the person is breathing or might have involuntary movements during the administration or the Thiopental

Case 3:06-cv-01206 Document 131 Filed 09/05/07 Page 2 of 64 PageID #: 3201

or after the administration of Thiopental, but maybe before the administration of the Pancuronium Bromide?

A.      I can't think of any.  I haven't observed any direct causes of Thiopental causing any involuntary movement.  So I have to say, in my experience, no.  I can't explain why Thiopental, administering that dose, would still be associated with some movement in and of itself in terms of being a drug effect, which I think is what you're asking.

There are, of course, other reasons why people would move involuntarily.  The most obvious one would be if they're having a seizure.  And that certainly can occur under a variety of circumstances where in conditions like this, in particular, apnea and acidosis, it irritates in the brain and the likelihood of a seizure.

Of course, in contrast or in converse, Thiopental is one of the best drugs of preventing seizures.  So for it to elicit a seizure under these circumstances or acidosis, too, initiate a seizure under this

Case 3:06-cv-01206 Document 131 Filed 09/05/07 Page 3 of 64 PageID #: 3202

circumstance would be unusual, I would think, especially giving the doses that we're talking about.

Again, yes, there are conditions which movement could occur. I would consider them unusual in the circumstance of Thiopental administration.

Q. We digressed a bit. But going on to Page 101 and the description of the administration of 3.75 grams of Thiopental, do you agree with Dr. Dershwitz's conclusions there?

A. Right. So he says on Page 102 the heart may still be beating, but it would be hard to detect. The blood pressure would be too low to palpate a pulse. You may not be able to even hear it conceivably with a stethoscope if there's no blood moving.

So I would say that, given what we've seen in terms of the effects of earlier doses, would be likely to occur within a third dose at that level.

Again, sort of, I guess, to finish the thought there, he said people may not have a pulse. And that certainly would, I think, be

quite likely at that dose.

Q. And not having a pulse, what would that be indicative of?

A. Indicative of not having a blood pressure and that the heart is not functioning in its task.

Q. Now, I believe you testified earlier with regard to whether the potassium chloride -- excuse me -- the other drugs, the Pancuronium Bromide, the potassium chloride, would be circulating sufficiently to produce the desired effect if the Thiopental had suppressed the circulation?

A. Correct.

Q. Would the circulation be completely suppressed? Do you have an opinion as to how suppressed the circulation would be?

A. Again -- right. Unless somebody's going to do the experiment, I couldn't tell you. I never observe these circumstances. So it would be hard for me to actually predict the level of suppression.

I would say it would be quite likely, but I would -- it's not an absolute. Again, I'm sort of an experimentalist, if you will.

I say if you want to be able to say something with some veracity, you need to carry out at least an experiment under similar conditions so you could draw a conclusion.

I'm not trying to beat around the bush. I think it's highly likely that someone's blood pressure would be severely depressed at that dosage level given what I've observed, again, even in clinical scenarios with healthy patients in terms of depression of blood pressure at other doses. I can't tell you a level of confidence around that.

Q. In a situation where you have these three drugs administered intravenously in the arm, the bend of the arm, and afterwards, after the death of the person, blood samples, other bodily fluid samples are taken from the condemned from various parts of the body and those blood levels give some indication of level of all three drugs in the system, would that be an indicator that the drugs have circulated somewhat at least through the body?

A. I think that makes sense. I just want

Case 3:06-cv-01206 Document 131 Filed 09/05/07 Page 6 of 64 PageID #: 3205

to point out I'm not a forensic pathologist. I think anyone who thinks about normal physiology would assume that, that that has occurred, that there certainly has been some distribution. With the timing of that relative to the sequence of events of administration, again, I could only speculate, and I'd rather not.

You'd certainly draw a conclusion there's been some distribution of drug if you could draw levels remote from the site of injection or draw blood remote from the site of injection and ascertain that there was drug in those locations.

I just sort of commented about plasma versus -- or blood versus organs, you know. It's much easier for fluid in a vessel like the veins and have it distribute just as if you poured it into the bottle here. Of course, what we really want to see is, is there adequate pressure to drive the blood to the capillaries to get to the organs of interest. So there's a significant pressure gradient there that requires that to be accomplished.

There clearly are some issues that, again, someone who's a forensic pathologist could help us answer. I'm not aware of any data here. Please point it out if I missed it where they took samples and established drug levels and other tissues other than in the plasma. But that kind of data would be helpful in, I think, answering the question you just posed.

Q. In your opinion, what would be the effect of the administration of 100 milligrams of Pancuronium Bromide?

A. Administered intravenously?

Q. Yes.

A. It would result in complete muscle relaxation within a minute or two.

Q. And what effect would that have on the body as far as its functioning?

A. Clearly, any motor activity would cease. So the most obvious would be -- respiration would be the most obvious sign. Whoever received that drug would not be able to move in response to a stimulus, whatever that might be. They can't move physically.

Q. And would the administration of that

after the administration of the Thiopental, would that further increase the, I guess, apnea effect that has been caused by the Thiopental?

A. Correct. So they're different mechanisms that we're talking about here, but both drugs would result in apnea.

I would say Thiopental is fairly common, again, especially in -- you talked about this dose response; the higher the dose, the more likely that is to be the case. Pancuronium, similarly, in the dose that you're talking about here means more doses. It's somewhat of an absolute, if you will.

So muscle relaxation will cause apnea at relatively small doses of Pancuronium Bromide, less than a 10th of the dose that you're talking about administering here. If that makes sense. They would both cause cessation of respiration.

Q. Going back to the Thiopental for a moment.

Do you have an opinion as to how long a person would remain unconscious, or I guess to a certain extent whether they would even

regain consciousness, after having been given five grams of Thiopental?
A. I think the likelihood would be quite low that they would regain consciousness given that dose. Not impossible, not zero, but it would be very low.
Q. I believe that you stated that giving a 1.25 gram dose would result in unconsciousness for a few minutes; is that correct?
A. Right.
Q. If you up that to 2.5, what would the duration of unconsciousness be in your opinion?
A. Again, I have no actual experience, so I'm basing my -- I would base my predictions upon the data such as the models that Dr. Dershwitz has used and others.
But I'll just sort of comment. If you progress up the dose, the dose response changes. So in other words, with Thiopental, subsequent administrations would, in my opinion, expedientially increase that length of time. So it would be more than adequate.
For example, at one dose somebody

stopped breathing for five minutes. A second dose, it would be likely, in my opinion, that apnea would last much longer than the additional five minutes.

So again, given those assumptions, I would say that someone would -- I guess you're talking about apnea or unconsciousness. But I guess the answer is somewhat the same, although the time course and the probabilities are different.

But it would certainly be extended for a longer period of time. Many minutes. Sorry I can't give you a number, but it would be a pretty long period of time. Long enough that certainly if apnea were associated with it, someone would become hypoxic and would expire as a result of that.

Q. Turning to the potassium chloride, are you familiar with the equations that were discussed in the deposition of Mr. Ramsey?

A. The Nernst equations?

Q. Yes.

A. I'm certainly familiar with what they're used for. Please don't ask me to draw them out for you. I haven't seen them

Case 3:06-cv-01206 Document 131 Filed 09/05/07 Page 11 of 64 PageID #: 3210

for a few years.

As a practical matter in physiology, we certainly studied those equations and used them, but it's been a little while. But yes, I'm familiar with their purpose in terms of describing the action potential and arresting potentials of cells, which is generally what he was using them to interpret.

Q. Do you have an opinion as to whether Mr. Ramsey properly used those equations to come to the conclusion that he did with regard to the 16.4 mEq per liter figure?

A. I have to be honest. I couldn't follow the logic completely through to derive that number. It may be my limitation not being a physiologist, but I had trouble finding that or drawing that specific conclusion by analyzing his data.

Q. I believe you may have also testified that that particular figure is not in any literature that you're familiar with?

A. Not that I'm aware of. I certainly haven't seen that number.

Q. In looking at the drugs that are used in the Tennessee protocol and the amounts

indicated and in the manner administered, if those drugs are administered properly, what would be the effect in your opinion?
A. I just have to think about whether or not it's appropriate for me to respond to that question that way. I hope you understand my position.
Q. I understand.
A. I'm not wanting to be perceived as either recommending a specific protocol for a specific outcome or not.
Q. And I'm not asking you to recommend that at all.
A. Thank you.
Q. All I want to know is if the administration of these three drugs would result in the death of a person to whom they were administered.
A. I think so. I think in virtually every circumstance, all of those -- in those doses successful in the vein, that everyone would expire as a result.
Q. To take it a step further, again, if administered properly where the five grams of Thiopental entered the blood system, the

circulation, and the Pancuronium Bromide and the potassium chloride were all successfully administered, in your opinion, would the person experience any pain?

A. Well, given -- obviously, the key issue here from my prospective is the concern about the risk of awareness at the time of the Pancuronium administration, and that's a key issue. I think it's unlikely that that would occur, but I would not say it's impossible given a couple of the circumstances that were described.

I have to -- again, we're dealing in incomplete information. For example, the California case, I'm not aware the protocols really met your assumptions, which was were the drugs administered intravenously. If they were, then that would be evidence that would cause me to be concerned about awareness, potential.

Again, it's unlikely, but could it be possible? If someone were aware at the time of administration of Pancuronium Bromide, I think that would -- whether that's described as actually painful, I'm not sure I would use

those terms. But it would be frightening if they were aware. Whether it's painful or not, I couldn't say.

Again, under your assumptions, if it was all administered successfully, I would say unlikely, highly unlikely, but not completely impossible.

Q. In preparing for this case, I'm assuming that you are really only familiar with execution experiences that have been recounted in the materials that have been provided to you; is that correct?
A. Correct.
Q. And most of those experiences deal with what had been described as botched executions; is that correct?
A. Correct.
Q. So you really have not been presented or reviewed any information with regard to successful executions?
A. That's correct. I'm not aware of -- I guess you would call the incidents of these -- what you would call the botched executions, correct, because I don't -- I'm not aware of the denominator of the total

executions and what would be considered successful in that regard.

Q. And likewise, your knowledge of the procedures and the process involved in the execution is limited to these materials as well; is that correct?

A. That is correct.

Q. And that would be, first and foremost, Tennessee's protocol and the procedures that are outlined in it; is that correct?

A. Correct. I'll just make one comment. I can't recall if this case was presented there, but I did read -- I can't remember what materials of an execution in North Carolina that was in the context of using the bispectral index monitor. And in reading about some other materials about that monitor, I think it was in the press. So I did recall that particular case.

But in terms of reviewing any detailed information on anything else and even reading about other cases, I have no other sources other than what I've reviewed here.

Q. Would it be fair to say that beyond Tennessee's protocol -- it may be limited

information provided in articles or statements that were made in the complaint -- that you have no other knowledge with regard to the personnel in other states who are involved in executions and what training they have?

A. Other than what's in here. There's obviously some description or allusion to those. But correct, I have no knowledge of any other protocols that are used in other states.

Q. You testified before regarding the person who does the push of the drugs and the need for them to have experience doing that.

First of all, is there a particular manner in which a push should be done?

What I'm asking is: Does it vary depending on -- does a push -- when I say push, I guess I'm talking about maybe the pressure that is applied, things of nature.

Does that vary under circumstances, say, what kind of drug is given or whatever the circumstances might be, or is there a general way, a common practice, of how one should engage in pushing a syringe into an

I.V. line?

A. In terms of rate of administration, there are a few factors that come into account. Occasionally, it's the type of medication. And that just more has to do with the administration. Rapid administration may be contraindicated, because it may have significant detrimental effects.

So we specifically say we administer them slow push. And there are some drugs in which we do that intentionally for that reason, not the medication as we're describing here.

And then there are other factors that have to just do with the syringe and the I.V. line in terms of your ability to push. Some are very difficult to push because they have resistance.

But I think more what you're talking about are factors and the conditions, and I would say the size of the intravenous catheter and the location of the catheter in a vein.

I was sort of alluding to earlier if

Case 3:06-cv-01206 Document 131 Filed 09/05/07 Page 18 of 64 PageID #: 3217

you use a lot of force to push through a small catheter in a small vein, you would stand a much higher likelihood of blowing that vein and causing infiltration. So in that circumstance, you may give administration of the lower pressure in a more slowly consequent way, administration of the drug.

And if you're, of course, administering through a large catheter and a large vein and you're confident about its placement, you can use higher rates of administration.

Does that answer your question?

Q. Yes. Again, to keep it in context of what we are dealing with, if you're administering these drugs through I.V. line into the arm and the person is pushing, I guess, too hard, what would be the effect and would you be able to see the results of that push too hard?

A. By definition, too hard would mean something is going to happen as a consequence of what you're doing, and so, presumably, an infiltration. There's a comment that you

could detect that in a variety of circumstances fairly easily, visually, depending on the location of the I.V.

In other circumstances, it would be difficult to detect because of the body habits of the patient, if they're obese. If the I.V. catheter is in a deeper vein, it may be difficult to do that. And again, it depends on how you're trying to detect that.

So yeah, your rate of administration, if it's affected and you're doing it too hard, could certainly risk infiltration and then the occurrence of some of these problems that we've been describing.

Q. If the I.V. line is placed in the arm -- I know you mentioned before about the hand and there being less tissue and so it's easy to observe.

If the I.V. line was placed in the bend of the arm, the term that you used?

A. Antecubital fossa.

Q. Would a person, in that instance, be able, who was visually observing that site, be able to determine if there was an infiltration?

Case 3:06-cv-01206 Document 131 Filed 09/05/07 Page 20 of 64 PageID #: 3219

A. It would be harder. They could certainly do it, but it's more difficult because of the size of the tissue and the ability for it to deposit fluid. It's called a fossa. It means a space. And so there's actual potential space there.

As I mentioned to you, we instruct our people for actually a couple of reasons to, hopefully, not primarily put their catheters in that location. One, because they're more prone to being kinked and they're not functioning, but also because it is a little harder to detect infiltration because of that space.

So we counter that by, as I mentioned, monitoring the administration site physically while we administering, and that helps us to assure that it's actually not infiltrating. So you can, but it's harder. We're talking about degrees here. I hope you appreciate that.

Q. Yes. It's harder, but it's not impossible?

A. Not impossible, but more difficult.

Q. Again, recognizing the limitations of

the material that you have presented for you, have you come across any information from any jurisdiction indicating that in the process of executions that there is someone present with the inmate to palpate, look, examine, the I.V. line during the course of the execution?
A. I don't recall in what I've read that any of the protocols have someone present to do that. I'm not aware that that is the case in any of the locations. I may have missed it. I do obviously know explicitly that in the Tennessee protocol there isn't any. But I'm not aware that anyone does that.
Q. And as has been stated before in questioning that persons with maybe 32 hours or so of training in I.V. insertion and maybe subsequent training, 4 hours or so in I.V. insertion, is it your opinion with that limited knowledge, if you will, that it would be inappropriate for them -- it would be problematic for those individuals to be monitoring an I.V. site visually during a push?
A. So when you describe -- let me

clarify. The training, those 32 hours plus in placement?

Q. Yes.

A. Of course, they're two different things we're talking about. One is being able to place the catheter, and the other is to monitor it during injections. If you're not getting trained in the latter, then, obviously, you would not be able to reliably do that to at least the level that I think you would desire.

So I would say that type of training would be inadequate in the ideal circumstance, again, to do that reliable. You have to decide what that is, what the success rate needs to be. I would say given -- sort of reflecting on my own practice, I would certainly not have that person responsible for the administration of drugs to a patient, because I would consider that to be inadequate training, from my perspective, without supervision and direct involvement of someone with a great deal more experience.

Q. Would you expect the persons with the

Case 3:06-cv-01206 Document 131 Filed 09/05/07 Page 23 of 64 PageID #: 3222

same qualifications and experience sufficient to provide medical treatment to patients on a daily basis, that a person who is involved in executions be required to have that same type of experience?

A. I think if you want the highest degree of reliability, that you would ask to have someone involved who does have daily experience in both the placement of catheters and troubleshooting those catheters in terms of assessing their functioning, and then, too, have similar experience in administration of drugs.

I would say yeah, that's a good standard in any kind of practice setting to expect, to be unsupervised. Again, I work in the training program. We have a lot of people who don't have that level of experience, but they're closely supervised. They have that direct presence of somebody who has a lot of experience. To be able to practice solo, I say yes, it needs to be somebody who independently does those on a day-to-day basis.

Q. Do you recall if the protocol set

forth any training that was to be conducted by the members of the execution team?
A. There was training described. I couldn't tell you how explicit that was.
THE COURT: Do you want to give him a reference?
BY MR. HUDSON:
Q. Well, let me ask you this.
A. Sure.
Q. If the persons who are involved --
THE COURT: Do you want me to give it to him? I've got it right here.
MR. HUDSON: I'm not sure if it has all the information on it.
No. It doesn't have the information that I want to ask about.
BY MR. HUDSON:
Q. If the persons who are involved in pushing the drugs and monitoring the I.V. site are required to practice pushing these drugs or pushing in their practice sessions saline into a live subject on a monthly basis, would that experience, in your opinion, count for anything as far as their ability to adequately push and adequately

monitor the administration of the drugs
during executions?
A. Obviously, it's better than nothing. But in terms of being able to rightly troubleshoot the problems you're going to have, I think it would be inadequate. Because you sort of point out a volunteer patient. And I don't know, but you may have more ideal circumstances in terms of being able to start I.V.s than you might see in the inmate population who has a history of drug abuse, and so I.V. access could be problematic. They may have vascular disease and a variety of other conditions that would make it challenging.
So it sort of depended on what you're using as a normal volunteer, but it might be hard to simulate sort of the problems that you're going to encounter and how to address them doing sort of a trial run. It's better than nothing. And there's certainly other things that you would address by doing that. I assume, by going through your protocol, people better understand the flow of that and are able to more reliably administer the

Case 3:06-cv-01206 Document 131 Filed 09/05/07 Page 26 of 64 PageID #: 3225

medications and get the sequence correct. So there probably are some other benefits.

But in terms of specifically monitoring the I.V.'s function and the adequacy of the injection, I would say that would be inadequate to do it highly reliably in the circumstances of an inmate.

Q. If the person, again, was not required -- did not do this on a daily basis as a part of their job or whatever, is there any training that you feel someone would need to go through in order to be capable of effectively monitoring and pushing the drugs, again, if this was not their daily task? And what would that training be?

A. I'm certain there is. I hope you understand I'd rather not comment on the details of describing the training for somebody who would be involved in that. But I'm certain that something could be created to achieve the appropriate level of training.

Again, our bar is set at somebody, in my opinion, at somebody who does this on a daily basis so they encounter a fair number of complications and how to address those.

So training would have to assure that.

But I honestly couldn't tell you. And honestly, I don't supervise training of non-medical professionals in I.V. placement. I'm dealing with a different scenario even in my own experience as an instructor. So I couldn't really tell you what that is. And for ethical reasons, I'd rather not. I hope you understand that.

Q. I understand.

I believe you may have stated this earlier. But just to be clear in my mind, I wanted to turn to the opinions of Dr. Lubarsky and ask you what your opinion is of his opinion regarding the postmortem redistribution analysis that he presented, not only in his deposition and his affidavit, but also in the Lancet article.

A. Right. So he had concluded that the plasma levels that were measured at sometime after were actually an over-estimate, in his opinion, of what the actual levels would have been at the time of death. And he had cited some evidence that supported that in terms of sort of describing the mechanisms of some of

Case 3:06-cv-01206 Document 131 Filed 09/05/07 Page 28 of 64 PageID #: 3227

the other drugs.

I have to say I'm not expert in that area, so it would be hard for me to draw the same conclusions from other medications. In my opinion, the right thing to do under these circumstances is to actually study this and make those determinations.

I know that's not the assumption you're working under, but I think -- and he would acknowledge, as would Dr. Dershwitz, that they're trying to -- they're in sort of unknown territory, if you will, in trying to draw some of the conclusions.

There are both correct in the principles they describe. And they both make reasonable hypotheses. The only way to really know who is correct is to test them.

So short of that, it's hard for me to say with any veracity whether or not I think his assumptions are correct. I think they're plausible as are Dr. Dershwitz's.

Q. Just so we could have them on the record, could you give us some background information regarding your education and employment experience?

A. Sure. I have my CV. But in terms of my training, I have a medical degree at Vanderbilt. And my other formal education, I have a master's in public health, which I also received at a later date at Vanderbilt. My physician training was performed at Johns Hopkins where I was a resident. I was on faculty there, and then subsequently came to Vanderbilt where I joined the faculty. And since, I've assumed the position of the chair of the Department of Physiology there. I'm the medical director of the operating rooms at Vanderbilt as well.

THE COURT: Do you want to make his CV as an exhibit to his deposition?

MR. HUDSON: That's fine.

(Document marked Exhibit No. 1.)

BY MR. HUDSON:

Q. And I am assuming that you have not authored any articles or anything that address the issue of lethal injection?

A. That is correct. I have not. I'm not planning on it, either.

THE COURT: In fact, he told me he's never had his deposition taken, right?

THE WITNESS: No. I'm a rookie, but you all have been nice to me.

THE COURT: Let's take about a 10-minute break.

(Brief recess was taken.)

THE COURT: So you're done?

MR. HUDSON: Yes. I have no further questions.

FURTHER QUESTIONS BY MR. KISSINGER:

Q. Dr. Higgins, during Mr. Hudson's examination, you were asked a number of questions about the effects of certain doses of sodium Thiopental, how long it would last and those type of things.

Would you agree that your response to those questions is dependent upon the qualifications which you made earlier, which were if the sodium Thiopental were properly administered and if it reached the site of action?

A. Correct.

Q. When we're talking about these numbers and these amounts of time, we're talking about theories; isn't it correct?

A. I'm sorry. When we were talking about numbers --
Q. When we're predicting these amounts of time, we're talking about a theory based upon the assumption that everything has gone according to plan as far as administration?
A. Right. As soon as the drug has been administered, our prediction of the observations is based upon -- when you say theory, it's based up models of the kinectics. It also is based upon clinical practice and experience, normal clinical practice. With that caveat, yes.
Q. When we talk about seeing the chest move and those type of things, those are tangible kinds of things that we can see. We may not know what we're looking at, but we know it's happening and we know that it's not expected; is that correct?
A. Well, obviously, we know it's happening. In terms of how much is expected or what it's expected to -- in the context of my previous answer, it was about Thiopental administration specifically. And I said yes, it would be unexpected with Thiopental.

If potassium were administered, it would be reasonable to expect. And I think it was alluded to in some of the testimony that there would be some movements not unexpected in that scenario. But in regards to the Thiopental, I would say that would be, in my experience, unexpected to see movement.
Q. One question which I think Mr. Hudson and myself may have overlooked earlier.
You had a chance to see the toxicology report in Coe?
A. Correct. That was in materials.
Q. And you're aware that there's been differing opinions offered as to whether that Thiopental level was indicative of consciousness or whether it was not indicative of consciousness; is that correct?
A. Correct.
Q. And did you have an opinion as to whether that Thiopental level seen in Mr. Coe's blood in his toxicology reports was indicative of unconsciousness?
A. I think it's very difficult given the circumstances of the time of the sample being drawn and. What we've already alluded to is

not quite understanding the changes postmortem. I think it would be difficult to draw any real conclusions from that number to be honest.

The number was referred to, which was 10 milligrams per liter, I believe, in sort of the studies that have been done. And patients would suggest that it's at the borderline of consciousness.

So in that context, you know, if you said this was a sample drawn in a normal subject, administration, you would say, I would have concerns about it. But again, we're talking about a sample that's drawn.

Specifically, I can't actually recall the amount of time, but it was a significant amount of time. I think it was even a day or longer afterwards. And I would say it's hard -- it would be hard, again, given that we don't understand this to draw any conclusions from that number.

Q. Given what we've talked about in terms of the qualifications when we're talking about the consciousness or the levels of consciousness and the time of consciousness,

the qualifications that it has to be properly administered, has to reach the site of action, and some of the things you just mentioned regarding the uncertainty in terms of attaching any particular -- or drawing any particular conclusion from the postmortem Thiopental levels, can you agree with Dr. Dershwitz when he makes statements to the effect that a particular inmate's -- that the percentage of chance that a particular inmate is unconscious ranks 99.99 percent or even higher?

I believe he goes into the thousands, the tens of thousands. Are you comfortable with those kinds of opinions?

A. Based upon what he was looking at, that is the modeling, you would say yes. But the assumptions there are different. They were derived from conditions which were different than what we're talking about in terms of this protocol.

So I would say that you have to be cautious in terms of applying those. Again, his methods are appropriate and are standard. You have to cautious on how you transfer

that -- what you find in one condition of the circumstance to another. And I would say you would have to exercise caution in this circumstance.

And normally, you know, honestly would not have been concerned, or as concerned, if I hadn't been aware of some of the reports. And again, it's hard to know exactly what happened. But assuming there was administration there, then I would be concerned. If there was successful administration, I would be concerned given the observations that the projections of probabilities related to consciousness are accurate under those circumstances.

Q. Dr. Higgins, given the importance of proper administration and training and things we've talked about during this deposition, would it be helpful for you if I were to provide you with copies of the depositions of the persons who actually carry out Tennessee executions?

A. In terms of what? I'm sorry.

Q. In terms of assessing your opinion regarding Tennessee's protocol, would it be

helpful if I were to provide you with copies of the depositions showing the training and background as well as the practices of the persons who actually are charged with carrying out those protocols?

A. It would be helpful to the extent that they actually were -- their observations are based upon the current protocol. I don't know what the -- I have never seen the previous protocol, if they should say so. If their experiences are referring to a protocol other than what I'm looking at here, it may be as applicable. But obviously, any information about practices that are similar and simple, those that we're talking about always help to better understand a problem. So I guess that's an obvious answer.

Q. If I were to tell you that each of these people participated in, I believe, participated in the execution of Mr. Workman under the new protocol, would that be something you could --

A. Sure. That would be helpful.

THE COURT: Fine.

MR. KISSINGER: We do have the

confidentiality issue. I don't see how it would be an issue if he had an objection to that limited disclosure.

THE COURT: Any objection to his having those depositions under the confidentiality provisions?

You wouldn't disclose them to anyone else?

THE WITNESS: Of course.

THE COURT: That would be one subject you would ask him about on Friday.

MR. KISSINGER: That would be correct if we have the opportunity.

THE COURT: Yes. I think that would be helpful.

Do you all have any objection to that?

MR. HUDSON: No.

THE COURT: No objection to that. Okay. So we'll arrange for that delivery.

Anything else?

MR. KISSINGER: No.

THE COURT: Do you have anything else?

MR. HUDSON: No.

THE COURT: Well, I do.

QUESTIONS BY JUDGE TRAUGER:
Q. In the protocol, as I read it, and I guess I should ask you if this is how you read it, it is the executioner, the person dubbed the executioner, who is actually pushing the drugs from the syringes into the line.
Is that how you read it?
A. That's right.
Q. And the executioner is either an EMT or --
A. Paramedic.
Q. Do you read that he's not an EMT?
A. Yes.
Q. He or she is not an EMT or any kind of a trained medical person. And it provides that the executioner receives initial and periodic instruction from a qualified medical professional.
What, if any, observations do you have about the fact that that's the person pushing the drugs through the line?
A. I guess that was sort of the circumstance of being alluded to previously, and I have concerns.

Again, my expectation, if you want to have a very high level of reliability in any kind of a practice administering through an I.V., that it needs to be somebody who -- and I use the term -- does it in their daily practice but is very familiar, has a lot of experience with that.

I would be concerned if somebody who does not have that experience -- and I'm not sure what the level of training is. I understand it's probably the situation you described, monthly working with a volunteer. I would consider that probably not to be adequate for what you're talking about.

Q. The monthly training that a volunteer uses, as I understand it, saline solution as opposed, obviously, to the drugs?

A. Right.

Q. What are your thoughts about the validity of that kind of training or invalidity of that kind of training?

A. Saline should inject identically to the drugs that we're talking about. The consistency's the same, the appearance is the same.

The one caveat is the situation I described whereas if you mix Thiopental and Pancuronium, they'll precipitate. In a situation where using saline, let's say somebody misuses the Stop Cock. And therefore, in the protocol, it's described that you give the Thiopental -- you give saline between the Thiopental dose and then you give the Pancuronium. So the saline, I presume, is that you're flushing the line to make sure that all the Thiopental is out of the line before you mix the Pancuronium so it won't precipitate.

So if you follow that, that makes a lot of sense. If you don't follow that, it will precipitate. If you're just practicing it with saline, you'll never know if somebody -- that would be one indicator of somebody not using a Stop Cock correctly, that you would -- using saline, you wouldn't know that.

There may be other means by which to do that, for example, people that's using different solutions that would precipitate as I just described them. I would say saline,

in general, is fine in terms of the consistency of the drugs, but you wouldn't -- one thing you wouldn't be able to detect is the Stop Cock malfunction or misuse.

Q. If everything goes click, click, click, there are 11 syringes, how long would that process take?

A. In 11 of 50 cc syringe. Syringes in a wide open I.V., the perfect situation, probably takes five minutes to administer all those. That's a lot of volume to administer through the line.

Again, I've never used I.V. tubing that long. The question then becomes how long does it take with an I.V. depending on the gauge of the I.V. So if it's a small I.V., high pressure, it may actually take longer to administer that much volume through it. It's pretty significant.

Q. Dr. Dershwitz, starting at 105 of his deposition where he talks about -- he says almost anyone can be taught to insert an intravenous catheter. Most important is to be able to -- that's on 106, I guess. Most important, be able to determine whether or

not the I.V. is in the right place and to troubleshoot, which comes with experience. Most common problem, tip of the catheter no longer in the vein. A person who monitors is as important as the person who inserts it. Person inserting should be someone who does this as part of their daily job. Person watching the I.V. should have experience in noticing whether there's a problem.

Do you agree with all of that testimony by him?

A. Yes. Absolutely.

Q. And in the description of the administration and monitoring in the protocol, I just ask you to review the insertion of the catheter and collection of I.V. lines, those two pages, and the chemical administration and I.V. monitoring.

Would you just review that quickly? I presume you have read that.

A. Yes, I have. So it goes to the points of what I would consider a standard approach to starting an I.V. catheter. So you identify candidate veins. And they suggest -- and under Point 6, the location

Case 3:06-cv-01206 Document 131 Filed 09/05/07 Page 43 of 64 PageID #: 3242

and the order of preference for those sites. And then under placement, the EMTs would do what I would consider a standard approach to placing a catheter in anyone. In applying the saline bag to it and a standard, it would all be considered standard.

Under 4, they talk about the troubleshooting aspects, which are once you open it up, just make sure there's a steady drip rate and flow. Also, that the chamber, the flash chamber, which is right at the catheter site, clears with initiation of the flow.

So it indicates that the blood is washing into the individual and the line is flowing. But it doesn't describe -- specifically here is, I can tell, is assessing the actual site. So they say is it flowing, does the blood clear out. But the question is where is it going, the saline. Is it going into the vessel, or is it going into other space? And I don't recall in that particular area.

On the next page, they do talk about that a little bit just prior to

Case 3:06-cv-01206 Document 131 Filed 09/05/07 Page 44 of 64 PageID #: 3243

administration. So they do it. They say all members of the team would monitor and make sure there's no swelling around the catheter to indicate the catheter is not sufficiently inside the vein. So I guess they're doing that continuously. I'm not quite sure, but this is the context of chemical administration. So at least they're doing it immediately prior to the administration.

So that's -- they don't describe the way they do that, but it's, I think, hopefully, obvious. Then they next switch to a situation whereby they're monitoring using the zoom camera. So they presumably have gone through and being physically present and looking at the site to where they're visually monitoring.

It spoke about, a little bit, some the limitations of that as being adequate, especially when you're injecting volume rapidly. But otherwise, I think in terms of the placement, it's a standard procedure.

Q. And what are the complications that would not be able to be seen through a camera, where the drug is not going where

it's supposed to go or any other complication? What could not be seen by someone in another room monitoring with a camera?

A. So the infiltration, again, in an obese patient, you might not actually be able to see that on the side.

Q. He might not be able to in an obese patient?

A. Correct. The other procedural problem that you might have that you're not seeing, I sort of alluded to the Stop Cock situation. I turn it the wrong way and I inject into the saline bag. For all intents and purposes at the site, that looks fine in that nothing's different there, but it's because the solution is going back into the bag. So you wouldn't see that by examining the site, the patient site, if that were the problem.

Q. Those are the only two you can think of?

A. Off the top of my head, yeah. Yeah. I guess if you had a precipitation and it's occluded. So that's one of the other problems that you can have. Now, you don't

Case 3:06-cv-01206 Document 131 Filed 09/05/07 Page 46 of 64 PageID #: 3245

see that visually. But if somebody's injecting it, you do have resistance. You would detect it a different way than visually inspecting the site. You detect it by resistance.

Q. And you wouldn't be able to push the plunger on the syringe?

A. Exactly. And that occlusion could be because of the precipitator, or it could be conceivably because of a blood clot or something like that.

Q. Dr. Lubarsky testifies about the fact that if inmates are receiving sedative drugs of some sort that that could interfere with the effect of the Thiopental; is that true?

A. Yes. A variety of patient factors. A variety of drugs can change the way your receptors either respond to Thiopental or the way you were able to metabolize it, or even, conceivably, your distribution, the redistribution.

So there's some drugs that will affect that, as well as some medical conditions will cause that same kind of effect. We talked about obesity being one. There are a variety

of others as well.
Q. What are some common drugs that could affect that?
A. Well, some of the things that we spoke about specifically, Benzodiazepines or other drugs that work receptors.
Q. What would those be given for?
A. Anxiety, sleep, or insomnia to promote sleep. Those are the primary.
Q. And what are the medical conditions that might affect it?
A. Well, the most common medical condition would be -- well, I say common, but not uncommon. It may be liver dysfunction. And liver dysfunction actually increases the sensitivity of Thiopental. It would be a variable that would alter a responsiveness. So that would be the most common.
Thiopental is protein bound. So you have more binding of the drug to those protein, and therefore, there's less that can go to the effector side of the brain. It would reduce the effectiveness, therefore, the thiopental. It's a relatively rare condition, but it's possible.

Case 3:06-cv-01206 Document 131 Filed 09/05/07 Page 48 of 64 PageID #: 3247

Q. Does the protocol, as you read it, account for taking inmates off of sleeping pills or anxiety medications or anything that they might be on in advance of the execution?
Did you see anything in the protocols that allowed for that?
A. I didn't. I'm trying to remember if it was a Tennessee protocol or another one that actually speaks specifically about administering a sedative on the request of the inmate. I think that's probably my guess, the more common practice to be considered more appropriate. I can't recall if it's in the Tennessee protocol or not.
Q. Upon request of the inmate administering a sedative, would that interfere with the absorption of the Thiopental?
A. Probably not, not on an acute basis. As a matter of fact, it would probably reduce -- it would increase the effectiveness of Thiopental. They work by similar mechanisms. It's more of the chronic administration that changes people's receptors or changes their metabolism.

Your liver enzymes may actually be hyperactive, and if your chronic using those medications. So you conceivably could be less sensitive to some of the drug effects. But it's chronic administration. Some of the other psychoactive drugs might have a similar effect.

Q. And how many days in advance of the execution would you need to take people off those medications?

A. I would be just purely speculating, but it would be in the time course of probably a couple of weeks. But this is -- could be variable with the individual as well as the medication, but there's sort of a range.

Q. And both Dr. Levey and Mr. Ramsey, I believe, spoke about potassium chloride perhaps being very painful if the person is not sufficiently unconscious. Is that accurate?

A. I would think so. Again, we don't administer potassium in these kind of doses in an awake patient. So it's hard to draw a reference.

But I will say that there definitely is discomfort for the administration of potassium through a peripheral vein, which again, we try to avoid. But occasionally, you have no other option. And we administer that through a slow infusion and there is some discomfort.

How you describe that is going to vary with the individual. It could certainly be mild. I don't know that anyone would describe it as excruciating, but it certainly has varying degrees of discomfort.

THE COURT: Anything else as a result of my questions?

MR. KISSINGER: No.

THE COURT: Doctor, thank you very much.

FURTHER DEPONENT SAITH NOT.

SWORN to before me when taken,
August 29, 2007

______________________________

Jackie Wisinger, Notary Public
State of Tennessee At Large

My Commission Expires: 11/14/2009

**MICHAEL S. HIGGINS, MD MPH**

Vanderbilt University School of Medicine
2301 VUH
1211 22nd Ave. South
Nashville, Tennessee 37232
(615) 936-1595
mike.higgins@vanderbilt.edu

## EDUCATION AND TRAINING

| | |
|---|---|
| 9/80-5/84 | Bachelor of Science in Natural Science<br>Lewis and Clark College<br>Portland, Oregon |
| 8/85-6/89 | Doctor of Medicine<br>Vanderbilt University School of Medicine<br>Nashville, Tennessee |
| 7/89-6/90 | Internal Medicine Internship<br>Department of Internal Medicine<br>Vanderbilt University Medical Center<br>Nashville, Tennessee |
| 7/90-6/92 | Anesthesiology Residency<br>Department of Anesthesiology and<br>Critical Care Medicine<br>Johns Hopkins Hospital<br>Baltimore, Maryland |
| 7/92-6/93 | Fellowship in Vascular and Thoracic Anesthesia<br>Department of Anesthesiology and<br>Critical Care Medicine<br>Johns Hopkins Hospital<br>Baltimore, Maryland |
| 9/96-5/98 | Masters Program in Public Health<br>Vanderbilt University School of Medicine<br>Nashville, Tennessee |

Exhibit: 2
Wit:
Date:
Rptr:

## ACADEMIC APPOINTMENTS

| | |
|---|---|
| 4/06- | Professor of Anesthesiology, Biomedical Informatics and Surgery, Departments of Anesthesiology, Biomedical Informatics, and Surgery, Vanderbilt University School of Medicine, Nashville, TN |
| 7/02-4/06 | Associate Professor of Anesthesiology, Biomedical Informatics and Surgery, Departments of Anesthesiology, Biomedical Informatics, and Surgery, Vanderbilt University School of Medicine, Nashville, TN |
| 4/00-6/02 | Assistant Professor of Anesthesiology and Biomedical Informatics, Departments of Anesthesiology & Biomedical Informatics, Vanderbilt University School of Medicine, Nashville, TN |
| 10/94-3/00 | Assistant Professor of Anesthesiology, Department of Anesthesiology, Vanderbilt University School of Medicine, Nashville, TN |
| 7/94-9/94 | Instructor, Department of Anesthesiology and Critical Care Medicine, Johns Hopkins Hospital, Baltimore, MD |
| 7/93-6/94 | Assistant, Department of Anesthesiology and Critical Care Medicine, Johns Hopkins Hospital, Baltimore, MD |

## CLINICAL APPOINTMENTS

| | |
|---|---|
| 10/94- | Staff Anesthesiologist<br>Department of Anesthesiology, Vanderbilt University Medical Center, Nashville, TN |
| 7/93-9/94 | Staff Anesthesiologist, Department of Anesthesiology, The Johns Hopkins Bayview Medical Center, Baltimore, MD |
| 7/92-6/93 | Clinical Fellow, Department of Anesthesiology, The Francis Scott Key Medical Center, Baltimore, MD |

## ADMINISTRATIVE APPOINTMENTS

*Current:*

| | |
|---|---|
| 4/06- | Chair<br>Department of Anesthesiology |

Vanderbilt University School of Medicine
Nashville, TN

7/02- Executive Medical Director of Perioperative Services
Vanderbilt University Medical Center
Nashville, TN

*Previous*:
Interim Chair, Department of Anesthesiology (2004-2006)
Vice-Chair for Clinical Affairs, Department of Anesthesiology (2002-2004)
Director, Division of Multispecialty Anesthesia (1999-2002)
Medical Director, Vanderbilt Preoperative Evaluation Center (1995-2001)
Chief, Section of Outpatient Anesthesia (1996-2000)
Medical Director, Vanderbilt Orthopaedic Surgicenter (1999-2000)
Medical Director, Day Surgery Center (1996-1999)
Director of Anesthesiology Clinical Informatics (1995-2000)
Director of Anesthesiology Quality Improvement (1995-2000)

## LICENSES AND CERTIFICATION

American Board of Anesthesiology (5/94, #23738)
National Board of Medical Examiners Diplomat (1990)
Tennessee Medical Licensure (1994, #MD26087)
DEA Drug Dispensing Certification (#BH3396478)
UPIN (#F42296)

## PROFESSIONAL ORGANIZATIONS

American Society of Anesthesiologists
Tennessee Society of Anesthesiologists
American Association of Clinical Directors
International Anesthesia Research Society
Society for Technology in Anesthesia
American Medical Informatics Association
American College of Physician Executives
Healthcare Information and Management Systems Society

## INSTITUTIONAL COMMITTEES

*Current*:
School of Medicine Executive Faculty (2004-)
Vanderbilt Medical Group Executive Committee (2004-)
Vanderbilt Medical Group Finance Committee (2004-)

Perioperative Directors Committee (Chair) (2004-)
Surgical Critical Care Steering Committee (2003-)
Medical Center Medical Board (2003-)
Executive Safety Council (2003-)
Institutional Quality Council (2003-)
Perioperative Enterprise Committee (Co-Chair) (2002-)
Perioperative Executive Committee (2001-)
Perioperative Informatics Steering Committee (Chair) (2000-)

*Previous*:
Transforming Organizations through People and Systems (TOPS) Council (2001-2002)
E3 Brain Trust—Electronic Record Steering Committee (2000-2001)
Surgical Rapid Redesign Committee, Preoperative Task Force (Chair) (1999-2002)
Operative Services Committee (1996-2002)
Vanderbilt Information Security and Privacy and Confidentiality Committee (1999)
Vanderbilt OR Redesign Preoperative Task Force (Chair) (1999)
VMG Informatics System Design Committee (1997-1999)
VMG Care Improvement Committee (1996-8)
Sinus Surgery Center Oversight Committee (1996-8)
VMG Care Improvement Committee Preoperative Testing Task Force (Chair) (1996-7)
Adult Ambulatory Surgery Patient Care Center (Chair) (1995-1997)
VUH Collaborative Care Implementation Team (1995-1997)
Otolaryngology-Oral Surgery Patient Care Center (1995-7)
Neurosurgery Plastic Surgery Patient Care Center (1995-7)
Perioperative Pharmacy Committee (Chair) (1995-2000)
Operative Services Information System Design Team (1995)
Perioperative Supplies and Equipment Committee (1994-6)

EXTERNAL COMMITTEES AND POSITIONS

TN Delegate to the ASA House of Delegates, 2006

AWARDS and RECOGNITION

Alpha Omega Alpha Medical Honor Society
1995-1996 Volker Striepe Anesthesiology Teacher-of-the-year Award
1997, IARS Scientific Exhibit Award
2004, ASA Scientific Exhibit Award

JOURNALS REVIEWED (AD HOC)

Journal of the American Medical Informatics Association
Healthcare Informatics
Journal of Clinical Anesthesia
Anesthesia and Analgesia

## TEACHING ACTIVITIES

### Clinical Teaching

Preoperative and intraoperative patient assessment, preoperative planning, problem solving and analysis. Use of Socratic and didactic methods. One day per week and call.

### Resident and Medical Student Lectures:

Various lectures related to vascular and thoracic anesthesia, airway management, regional anesthesia, temperature management, informatics, and patient safety.

### Continuing Medical Education

"The OR of the future is now", Combined Anesthesiology and Surgery Grand Rounds, The Johns Hopkins Hospital, Baltimore, MD, November, 2004.

"Bridging the Quality Chasm in Perioperative Care", Tennessee Society of Anesthesiologists Annual Meeting, Nashville, TN, February, 2003.

"Preoperative Airway Assessment", Vanderbilt Perioperative Management Course, Nashville, TN, October 2001, 2002.

"Electronic Charting Supports Quality Improvement in Surgery", TANA, Nashville, TN 2000.

"Data Management for a Perioperative Medicine Service", ASA Annual meeting, Orlando, FL 1998.

"Perioperative Evaluation and Management of the Surgical Patient with Cardiovascular Disease", Medical Grand Rounds, Vanderbilt University School of Medicine, Nashville, TN 1997.

Course Director, "Vanderbilt Emergency Airway Management Course", VUMC, Nashville, TN, 1996, 1997.

"Indirect Intubation Techniques", The Johns Hopkins Airway Management Course, The Johns Hopkins Hospital, Baltimore MD, 1995.

### Research Supervision

1998 Yuh-Show Tsai, PhD, Vanderbilt University. "Knowledge discovery with medical databases: a case-based reasoning approach."

2001 Russell M. Waitman, PhD, Vanderbilt University " "Knowledge Discovery in Perioperative Databases using Rule Induction: Hypothesis Testing, Decision Support, and Clinical Guideline Assessment."

2002 Michael Jones, MS, Vanderbilt University. "Development of an electronic charting system for documenting patient preoperative evaluation."

FUNDING

M.I.R.E. Advanced Technology Ltd., Investigation of New Patient Warming Technology, Principal Investigator, $160K (2000-2002)

Astra-Zeneca Inc., Retrospective Analysis of the Effectiveness of Various Propofol Preparations, Co-Investigator, $40K (2000-2001)

Astra-Zeneca Inc., Prospective Investigation of Diprivan Versus Sulfite-containing Propofol, Co-Investigator, $20K (2001)

NIH/AHRQ RFA HS 04-010, Transforming Healthcare Quality Through Information Technology Planning Grant: Improving the Quality and Safety of Regional Surgical Patient Care Through the Creation of a Multi-institutional Partnership for the Implementation and Support of Perioperative Informatics Tools, Principal Investigator (30% effort), $196,700 (2004-2006)

DOD/TATRC "Vigilance System© Surgical Safety Advanced Technology Program", Principal Investigator (20% Effort, $1.5M, 2007-2009)

PUBLICATIONS AND PRESENTATIONS

*Articles:*

1. Higgins MS, Givogre JL, Marco AP, Blumenthal PD, Furman WR: Recovery from outpatient laparoscopic tubal ligation is not improved by preoperative administration of ketorolac or ibuprofen. Anesthesia and Analgesia 79:274-80, 1994.

2. Frank SM, Higgins MS, Breslow MJ, Fleisher LA, Gorman RB, Sitzmann JV, Raff H, Beattie C: The catecholamine, cortisol, and hemodynamic responses to mild perioperative hypothermia: a randomized clinical trial. Anesthesiology, 82: 83-93, 1995.

3 Frank SM, Fleisher, LA, Gorman RB, Higgins MS, Breslow MJ, Sitzmann JV: Multivariate determinants of early postoperative oxygen consumption in elderly patients: effects of shivering, body temperature, and gender. Anesthesiology 83:241-9,1995.

4 Tobias JD, Higgins MS: Capnography during transtracheal needle cricothyrotomy. Anesthesia and Analgesia 81:1077-8, 1995.

5. Frank SM, Higgins MS, Fleisher LA, Sitzmann JV, Raff H, Breslow MJ,: Adrenergic, respiratory, and cardiovascular effects of core cooling in humans. Am J Physiology 272:R557-R562, 1997.

6. Frank SM, Fleisher LA, Breslow, MJ, Higgins MS, Olson KF, Kelly S, Beattie C: Perioperative maintenance of normothermia reduces the incidence of morbid cardiac events. JAMA. 277:1127-1134, 1997.

7. DeLoach L, Higgins MS, Caplan AB, Stiff JL: The Visual analog scale in the immediate postoperative period: intrasubject variablility and correlation with a numeric scale. Anesthesia and Analgesia 86:102-106, 1998.

8. Saha AK, Higgins MS, Walker G, Badr A, Berman L, Comparison of awake endotracheal intubation in patients with cervical spine disease: the lighted intubating stylet versus the fiberoptic bronchoscope. Anesthesia and Analgesia 87:477-9, 1998

9. Lewis TC, Janicki PK, Higgins MS, Szmyd-Hogan K, Beattie C: Anesthetic potency of propofol with disodium edetate versus sulfite-containing propofol in patients undergoing magnetic resonance imaging: a retrospective analysis. Am J Anes 27:30-2, 2000.

10. King PH, Pierce D, Higgins MS, Beattie C, Waitman LR: A proposed method for the measurement of anesthetist care variability. J Clin Monitoring and Computing 16:121-5, 2000.

11. McCarty EC, Spindler KP, Tingstad E, Shyr Y, Higgins M: Does intraarticular morphine improve pain control with femoral nerve block after anterior cruciate ligament reconstruction?. Am J Sports Med 29: 327-332, 2001.

12. Janicki PK, Higgins MS, Janssen J, Johnson RF, Beattie C: Comparison of two different temperature maintenance strategies during open abdominal surgery. Anesthesiology 95:868-74, 2001.

13. Donahue BS, Gailani D, Higgins MS, Drinkwater DC, George AL: Factor V Leiden Protects Against Blood Loss and Transfusion After Cardiac Surgery. Circulation 107: 1003 – 1008, 2003.

14. St. Jacques P, Higgins MS: Beyond Cancellations—Decreased Day of Surgery Delays from a Dedicated Preoperative Clinic May Provide Cost Savings,: J Clin Anesth. Sep;16(6):478-9, 2004.

15. St. Jacques P, Patel N, Higgins MS, Improving Operating Room Efficiency Through Profiling and Incentives. J Clinical Anesthesia 16:523-28, 2004.

16. Marco AP, Greenwald MK, Higgins MS: A preliminary study of 24-hour post-cesarean patient controlled analgesia: postoperative pain reports and morphine requests/utilization are greater in abstaining smokers than non-smokers. Med Sci Monit. 2005 May 25;11(6):CR255-261

17. Leming-Lee S, France DJ, Feistritzer NR, Kuntz A, Sanders F, Higgins MS: Crew resource management in perioperative services: navigating the implementation road map, J Clin Outcomes Man. 12:7, 2005.

18. St. Jacques P, Patel N, France D, Deshpande J, Higgins MS: Use of computer prompts improves compliance with redosing of perioperative prophylactic antibiotics. Surgical Infections. 6(2), 215-221, 2005.

19. France D, St. Jacques P, Pilla M, Lai E, Higgins MS: Evaluation of a Hands-Free Wireless Communication Device in the Perioperative Environment. Telemedicine and E-Health Journal. 12, 2006.

20. France DJ, Leming-Lee S, Jackson T, Feistritzer NR, Higgins MS: An Observational Analysis of Surgical Team Compliance with Perioperative Safety Practices after Crew Resource management Training, *(In press)*.

*Chapters and reviews*

1. Frank SM, Raja SN, Fleisher LA, Beattie C, Higgins MS, Breslow MJ: Cardiovascular and adrenergic manifestations of cold stress. In: Thermal balance in health and disease: advances in pharmacological sciences, 1994.

2. Higgins MS: Anesthesia for Iliostomy. In: Essence of Anesthesia Practice. Eds. LA Fleisher and MF Roizen, WB Saunders, 1997.

3. Higgins MS: Preoperative Data Management, in Handbook on Preoperative Evaluation, Sweitzer BJ, Ed. Lippincott Williams & Wilkins, 2000.

4. Higgins MS: Data Management for a Perioperative Medicine Practice, in Anesthesiology Clinics of North America, Vol 18, No 3, WB Saunders Co., 2000.

*Letters & Case Reports*

1. Higgins MS, Marco AP: An aid in oral fiberoptic intubation. Anesthesiology 77:1236-7, 1992.

2. Higgins MS, Stiff JL: Pitfalls in performing meta-analysis: I. Anesthesiology 79:405,1993.

3. Higgins MS, Wherry T: Topical anesthesia of the airway using the lighted stylet Anesthesiology 79:1148, 1993.

4. Higgins MS, Fleisher LA: A caution in the interpretation of heart rate variability data. Anesthesia and Analgesia 79:812, 1994.

5. Higgins MS, Clarkson KP, Blanks ST: Combined use of indirect orotracheal intubation techniques. Anesthesia and Analgesia 82:216-217, 1996.

6. Higgins MS, Deshpande JK, Badr A: New video system improves teaching of direct laryngoscopy. Anesthesiology 84:1010-11, 1996.

7. Durrani MA, Makrandi VR, Higgins MS, Donovan KL: An unusual complication: development of compartment syndrome of the forearm following surgery for recurrent epistaxis. Am J Anes 24:269-70, 1997.

*Abstracts and Presentations at Scientific Meetings*

1. Mark L, Schauble J, Beattie C, Ervanian J, Higgins M. Effective dissemination of critical information: difficult airway/intubation. 46th PGA, 12/92.

2. Gorman RB, Frank SM, Kelly S, Fleisher LA, Higgins MS, Furman W, Beattie C, Sitzman JV: Inadvertent hyupothermia and convective warming: effects on early postoperative hemodynamic and metabolic demands. Anesthesiology 79:A135, 1993.

3. Frank SM, Fleisher LA, Breslow MJ, Jiang BH, Myers T, Wu P, Olson KF, Gorman RB, Higgins MS, Sitzmann JV, Beattie C. Mild postoperative hypothermia triggers a significant adrenergic but not metabolic response. SCA, 1994.

4. Higgins MS, Fleisher LA, Frank SM, Soto AC, Breslow MJ, Sitzmann JV: Hypothermia is associated with cardiac sympathetic activation as measured by heart rate variability. SCA, 1994.

5. Higgins MS, Frank SM, Breslow MJ, Fleisher LA, Beattie C: The adrenergic response to mild core hypothermia. Anesthesiology, A234, 1994.

6. Frank SM, Higgins MS, Breslow MJ, Fleisher LA, Beattie C: Inadvertent hypothermia and skin-surface warming: effects on the perioperative catecholamine response. Anesthesiology A253, 1994.

7. Higgins MS, Frank SM, Fleisher LA, Jiang BH, Breslow MJ: Cardiac sympathetic activation during acute core hypothermia. Anesthesiology A 254, 1994.

8. Frank SM, Higgins MS, Breslow MJ, Fleisher LA, Gorman RB: Inadvertent hypothermia and convective warming: effects on perioperative catecholamines. SCA, 1995.

9. Frank SM, Fleisher LA, Breslow MJ, Higgins MS, Olson KF, Meyer TP, Beattie C: Postoperative ventricular tachycardia occurs more frequently in mildy hypothermic patients: a prospective randomized trial, SCA, 1995.

10. Levitan RM, Higgins MS: Direct laryngoscopy video system. The Academic Emergency Medicine, San Antonio, TX, May 1995.

11. Levitan RM, Higgins MS: The ocularity of laryngeal view. ACEP Scientific Assembly, 1995

12. DeLoach L, Higgins MS, Caplan AB, Stiff JL: The validity of the visual analog scale for the measurement of pain in the postoperative patient. Anesthesiology 83:A880, 1995.

13. Frank SM, Fleisher LA, Breslow MJ, Higgins MS, Olson KF, Myers TP, Beattie C: Postoperative ventricular tachycardia occurs more frequently in mildly hypothermic patients: a prospective randomized trial. Anesthesiology 83:A79, 1995.

14. King PH, Jones M, Higgins MS, Beattie C, Patel N:Computerization of the Preoperative Patient Assessment, 16th International Symposium on Computing in Anesthesia and Intensive Care, May 9-11, 1996, Erasmus University, Rotterdam, The Netherlands.

15. Badr A, Higgins MS, Clarkson K, Dalton H, Johnson R:Comparison of Intravenous and transtracheal administration of lidocaine for tracheal anesthesia in awake fiberoptic intubation, Anesthesiology 85:A226, 1996.

16. Frank SF, Fleisher LA, Breslow M, Higgins M, Beattie C: Maintenance of normothermia with forced-air warming reduces the incidence of electrocardiographic and morbid cardiac events, Anesthesiology 85:A106, 1996.

17. King PH, Jones M, Higgins M, Patel N, Computerization of the preoperative patient assessment, Int J Clin Mon, 13:132-133, 1996.

18. Saha AK, Higgins MS, Walker G, Badr A, Berman L, The lighted intubating stylet is faster than fiberoptic bronchoscopy for awake intubation in patients with c-spine disease, Anesthesiology, 87:A147, 1997

19. Higgins MS, Beattie C, St. Jaques P, Patel N, Yarborough J, Tsai YS, The Vanderbilt perioperative information management system forms foundation for outcomes management, AMIA Fall Symposium, 10/97, Nashville, TN.

20. Waitman, LR, Higgins MS, King PH, Miller ML, Patel N, Perioperative information via the web enables efficiency in patient care, AMIA Fall Symposium, 10/97, Nashville, TN.

21. Tsai YS, King PH, Higgins MS, Pierce D, Patel NP, An expert-guided decision tree construction strategy: an application in knowledge discovery with medical databases, AMIA Fall Symposium, 10/97, Nashville, TN.

22. Janicki PK, Lewis TC, Higgins MS, Szmyd-Hogan D, Beattie C: The anesthetic potency of two formulations of propofol in pediatric patients. Anesthesiology 93:A65, 2000.

23. Janicki PK, Higgins MS, Walker G, Janssen J, Pretorius M: Maintenance of normothermia in surgical patients: new technology evaluated. Anesthesiology 93:A386, 2000.

24. Janicki PK, Higgins MS, Stoica C, Pai R, Walia A: Comparison of water warming garment and air warming system in prevention of hypothermia during liver transplantation. Anesthesiology 93:A385, 2000.

25. St. Jacques PS, Randa S, Feistritzer N, Higgins MS: The Vanderbilt Indicator of Surgical Efficiency (VISE), Association of Anesthesia Clinical Directors, 2002.

26. St. Jacques PS, Randa S, Feistritzer N, Higgins MS: Rotating Trauma Room Improves OR Efficieny, Association of Anesthesia Clinical Directors, 2002.

27. St. Jacques P, Patel N, Higgins MS: The use of Vigilance technology to improve safety and efficiency in patient care, Congressional Healthcare Forum, 2003.

28. Speroff T, Gaffney FA, Grogan EL, Higgins MS, Seddon R, France D, Nixon WR: Crew Resource Management: From Aviation to Healthcare, European Forum for Safety in Healthcare, 2004.

29. St. Jacques P, Patel N, Higgins MS: The use of Vigilance technology to improve safety and efficiency in the operating room, ASA Annual meeting, 2004.