# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

EDWARD JEROME HARBISON,           )
                                  )
    Plaintiff,                     )
                                  )
v.                                )     Case No. 3:06-cv-01206
                                  )     Judge Trauger
GEORGE LITTLE, in his official capacity   )
as Tennessee's Commissioner of Correction,   )
RICKY BELL, in his official capacity as   )
Warden, Riverbend Maximum Security   )
Institution, JOHN DOE PHYSICIANS 1-100,   )
JOHN DOE PHARMACISTS 1-100,       )
JOHN DOE MEDICAL PERSONNEL 1-100,   )
JOHN DOE EXECUTIONERS 1-100, and   )
JOHN DOES 1-100,                  )
                                  )
    Defendants.                    )

## MEMORANDUM

Pending before the court are the Second Motion to Amend Complaint filed by plaintiff

Edward Jerome Harbison (Docket No. 169), to which the defendants have filed a response

(Docket No. 171) and the plaintiff has filed a reply (Docket No. 175), and the defendants'

Motion to Vacate Injunction and Enter Judgment (Docket No. 172), to which the plaintiff has

filed a response (Docket No. 176). For the reasons discussed below, the plaintiff's motion will

be denied, and the defendants' motion will be granted.

## BACKGROUND

The plaintiff, Edward Jerome Harbison, was sentenced to death by the state of Tennessee

1

in 1984 after being convicted of first-degree murder, second-degree burglary, and grand larceny.[1] His conviction withstood direct appeal in state court and collateral attack in federal court. In 2006, Harbison filed this 42 U.S.C. § 1983 action, challenging the constitutionality of Tennessee's lethal injection protocol.

Tennessee's protocol calls for condemned prisoners to be injected successively with three drugs. In order, these are: (1) sodium thiopental, an anesthetic that renders the prisoner unconscious; (2) pancuronium bromide, a muscle paralytic that prevents the prisoner from moving and paralyzes the diaphragm, preventing the prisoner from breathing; and (3) potassium chloride, which causes cardiac arrest. It is undisputed that if the prisoner is not properly anesthetized by the sodium thiopental, the experience of being injected with the latter two drugs is excruciatingly painful. Harbison's central argument is that Tennessee's protocol creates a substantial risk that this will happen.

In September 2007, the court held a four-day bench trial on Harbison's claims. The court found that there were a number of flaws in the lethal injection procedure that could lead to improper administration of the sodium thiopental. Specifically, the protocol failed to require execution personnel to check the prisoner's level of consciousness after the sodium thiopental had been injected, did not require adequate training for personnel regarding drug handling and intravenous catheterization, and did not require personnel to monitor the IV lines during the

---

[1] Unless otherwise noted, the facts are drawn from the court's previous Memorandum summarizing its findings following the bench trial. *See Harbison v. Little*, 511 F. Supp. 2d 872 (M.D. Tenn. 2007). Citations to the trial transcript, which has been filed at Docket Nos. 138-39 and 142-43, will be noted as "(TR __.)."

administration of the drugs. *Harbison v. Little*, 511 F. Supp. 2d 872, 884-92 (M.D. Tenn. 2007). A state committee had recommended the addition of protective measures to check for consciousness, but the Tennessee Commissioner of Corrections rejected the recommendation. *Id.* at 898.

The court held that the three-drug protocol violated Harbison's Eighth and Fourteenth Amendment rights because it presented "a substantial risk of unnecessary pain" that was disregarded by the Commissioner. *Id.* at 903. It also held that the Commissioner acted with deliberate indifference to the risk when he rejected the committee's advice to adopt the so-called one-drug protocol, under which the prisoner would receive only doses of sodium thiopental. *Id.* at 898. The court entered an injunction preventing Tennessee from executing Harbison via the three-drug protocol. (Docket No. 148.)

After the court issued its decision, the Supreme Court upheld the constitutionality of Kentucky's lethal injection protocol in *Baze v. Rees*, 553 U.S. 35 (2008). Kentucky's protocol employs the same three drugs as Tennessee's. The inmate petitioners in *Baze* argued that Kentucky's protocol was flawed because it allowed the employment of undertrained execution personnel, it did not provide safeguards to ensure effective intravenous catheterization, and it did not require personnel to test the prisoner's consciousness after administration of the sodium thiopental. *Id.* at 54-56. They also argued that Kentucky was constitutionally required to adopt the one-drug protocol. *Id.* at 56-60.

The Court issued a number of opinions, with the plurality opinion representing the views

of three Justices.[2]  Rejecting the inmates' arguments, the plurality held that Kentucky's protocol, as well as any protocol that is "substantially similar" to Kentucky's, is constitutional because it does not "create[] a demonstrated risk of severe pain."  *Id.* at 61.

The Sixth Circuit heard the instant defendants' appeal after *Baze* was decided.  In *Harbison v. Little*, 571 F.3d 531 (6th Cir. 2009), *cert. denied*, 130 S. Ct. 1689 (2010), the appellate court found that Tennessee's lethal injection protocol is constitutional because it is substantially similar to Kentucky's.  *Id.* at 537.  The court stated that "*Baze* addressed the same risks identified by the trial court, but reached the conclusion that they did not rise to the level of a constitutional violation."  *Id.*  It remanded the case to this court.

## ANALYSIS

Now that the case has been remanded, the plaintiff has filed a Motion to Amend pursuant to Federal Rule of Civil Procedure 15.  He seeks to: (1) amend claims that he argues are still pending; (2) add two claims; (3) supplement the complaint with evidence that post-dates the bench trial; and (4) remove certain defendants.  (Docket No. 169 at 2-3.)  The defendants oppose the Motion to Amend and have filed a Motion to Vacate Injunction and Enter Judgment, requesting that the court dismiss the action with prejudice.

## I.      Motion to Vacate Injunction

---

[2] Chief Justice Roberts wrote the plurality opinion, which was joined by Justices Kennedy and Alito; Justice Alito wrote a separate concurrence; Justice Stevens wrote an opinion concurring in the judgment that nevertheless questioned the justification for the death penalty; Justice Scalia wrote an opinion, joined by Justice Thomas, refuting Justice Stevens' view of the death penalty; Justice Thomas wrote an opinion, joined by Justice Scalia, concurring in the judgment; Justice Breyer wrote an opinion concurring in the judgment; and Justice Ginsburg, joined by Justice Souter, dissented.

4

The Sixth Circuit held that "Tennessee's protocol must be upheld," and it "vacate[d] the decision finding the Tennessee lethal injection protocol violative of the Eighth Amendment." *Harbison*, 571 F.3d at 537, 539. It remanded to this court "to vacate the injunction barring the State from executing Harbison and to enter judgment consistent with this decision." *Id.* at 539. As explained below, the Sixth Circuit's decision resolved all of Harbison's pending claims, and the new evidence submitted by the plaintiff does not warrant leave to amend or to supplement. Accordingly, this court will vacate the injunction and will dismiss the case with prejudice.

## II.    Motion to Amend

Harbison concedes that the Sixth Circuit's ruling requires dismissal of some of his claims, but he argues that four claims have survived because they were not addressed by this court or the appellate court. In addition, he has submitted evidence, obtained after the bench trial, regarding the autopsies of two executed Tennessee prisoners. He seeks to amend and to supplement his complaint pursuant to Federal Rules of Civil Procedure 15(a)(2) and 15(d).[3]

Rule 15(a)(2) allows a party to amend its pleading with leave from the court, and Rule 15(d) allows the court to "permit a party to serve a supplemental pleading setting out any . . . event that happened after the date of the pleading to be supplemented." Fed. R. Civ. P. 15(d). Although Rule 15(a)(2) provides that a court should "freely give leave [to amend] when justice so requires," Fed. R. Civ. P. 15(a)(2), "[a] motion to amend a complaint should be denied if the

---

[3] The plaintiff purports to seek leave to amend under Rule 15(b)(2), but that subsection applies "[w]hen an issue not raised by the pleadings is tried by the parties' express or implied consent." Fed. R. Civ. P. 15(b)(2). Here, the parties did not try any issues that were not raised in Harbison's pleadings. It appears that the plaintiff actually intends to seek leave to amend under Rule 15(a)(2); the court will analyze the motion accordingly.

5

amendment . . . would be futile," *Colvin v. Caruso*, 605 F.3d 282, 294 (6th Cir. 2010) (citation omitted). An amendment is futile "if it merely restates the same facts as the original complaint in different terms [or] reasserts a claim on which the court previously ruled." 3 James Wm. Moore *et al.*, Moore's Federal Practice § 15.15[3] (3d ed.); *see also Winget v. JP Morgan Chase Bank, N.A.*, 537 F.3d 565, 573 (6th Cir. 2008) (noting that an amendment is futile when the claim is barred by res judicata). The same standard applies to a Rule 15(d) motion to supplement. *See Spies v. Voinovich*, 48 Fed. Appx. 520, 527 (6th Cir. 2002).

The plaintiff's Amended Complaint was the operative pleading when this court held the bench trial. (*See* Docket No. 63.) The Amended Complaint lists seven counts, each of which assert that Tennessee's lethal injection protocol somehow violates Harbison's Eighth Amendment rights. The counts allege, respectively, that: (1) the protocol creates a substantial risk of the unnecessary and wanton infliction of pain; (2) the protocol's use of sodium thiopental is unconstitutional; (3) the protocol's use of pancuronium bromide is unconstitutional; (4) the protocol's use of potassium chloride is unconstitutional; (5) the protocol fails to provide adequately qualified and trained personnel; (6) the protocol fails to comport with best medical practices to reduce the risk of faulty injection; and (7) the protocol violates federal law by requiring the administration of controlled substances without a medical prescription. (*Id.* ¶¶ 114-81.)

Ultimately, the court must determine (1) whether any claims from the plaintiff's Amended Complaint have survived the Sixth Circuit's decision and (2) whether the new evidence submitted by the plaintiff warrants leave to supplement.

6

**A.      Amendment of Pre-Existing Claims**

Harbison argues that Counts Two, Three, Four, and Seven from his Amended Complaint remain unresolved.  Although the plaintiff nominally seeks to amend these counts, the proposed amended versions contain no material changes from the previous versions, aside from allegations regarding the newly discovered autopsy evidence, which the court will address later in this Memorandum.

**1.      Counts Two, Three, and Four**

According to the plaintiff, Counts Two, Three, and Four of the Amended Complaint are distinguishable from Counts One, Five, and Six.  The former, he argues, have survived because they "allege[] that Tennessee's choice to use each of the three drugs required under its three-drug protocol, in and of itself, violates the Eighth Amendment," (Docket No. 175 at 4), whereas the latter, which he admits have been adjudicated, allege that "there exists a substantial risk of serious harm in the administration of Tennessee's three-drug protocol that will result in wanton, unnecessary and severe pain," (Docket No. 169 at 4).

This distinction is illusory.  The only reason that Tennessee's choice of drugs would violate the Eighth Amendment is if the drugs create a "substantial" "risk of severe pain."  *Baze*, 553 U.S. at 61.  The Sixth Circuit found that Tennessee's three-drug protocol did not create such a risk.  *Harbison*, 571 F.3d at 536.  The conclusion that the protocol, as a whole, is constitutional necessarily resolves the question of whether the protocol's use of each individual drug is constitutional.

Furthermore, the allegations in Counts One through Six substantially overlap, and the

7

fact that one set of counts was adjudicated means that the other set was also adjudicated.  The main thrust of all six counts is that Tennessee's protocol does not ensure that sodium thiopental will properly anesthetize the prisoner, creating a risk that he or she will be conscious during the remainder of the execution.  All of the counts are premised on this alleged risk.

For example, Count Two, which relates exclusively to sodium thiopental and which the plaintiff argues has not been adjudicated, contains four main allegations.  First, it alleges that sodium thiopental "fails to provide sufficient anesthetic depth to prevent the condemned from experiencing . . . pain and psychological torture . . . ." and that "[i]f the intended amount of Sodium Thiopental fails to reach the condemned's brain (which can occur as a result of an infiltration, leakage, mixing error, or other causes) . . . the prisoner could reawaken during the execution process."  (Docket No. 63 ¶¶ 134, 134(b).)  Second, it alleges that a "generic dose" of the drug, as opposed to a dose that "accounts for the condemned's health history and physical condition," might not effectively induce anesthesia.  (*Id.* ¶ 135.)  Third, it alleges that "[t]he absence of trained personnel to mix, combine and administer" the drug means that a prisoner might not "receive the necessary amount."  (*Id.* ¶ 136.)  Finally, it alleges that the protocol "fails to include procedures to insure that the condemned is unconscious after the administration" of the drug.  (*Id.* ¶ 137.)

Counts Three and Four, which relate exclusively to pancuronium bromide and potassium chloride, are similarly premised on the risk that the prisoner will not be sufficiently anesthetized by the sodium thiopental.  (*See id.* ¶¶ 141 (alleging that pancuronium bromide "causes excessive physical and psychological pain, and, by masking consciousness of the prisoner, it prevents any

8

remedial acts should the Sodium Thiopental fail to place the prisoner in a surgical plane of anesthesia."), 154 (alleging that, "[i]f Mr. Harbison remains conscious during the administration of the Potassium Chloride, he will suffer excruciating pain.").)  The only possible harm alleged in these counts is that Harbison might receive the second two drugs while conscious.[4]

These are all essentially duplicative of the allegations in Count One, which Harbison admits was adjudicated.  Count One alleges that the protocol does not "take[] precautions to insure that the condemned is adequately anesthetized before administering the second and third drugs."  (*Id.* ¶ 127(d).)  It alleges that the prisoner "is likely inadequately anesthetized" and thus "experiences the sensation and horror of suffocation from the Pancuronium Bromide, as well the excruciating pain associated with the introduction of Potassium Chloride."  (*Id.* ¶ 129.)  It alleges that execution personnel do not "possess the training, experience, and expertise needed to administer [the drugs] properly."  (*Id.* ¶ 127(d).)  Finally, it alleges that "[t]he Defendants could choose to use different chemicals that pose a low risk of administration error."  (*Id.* ¶ 127(a).)

These allegations were indisputably the focus of the bench trial, and the court heard extensive testimony regarding the effect of the three drugs.  The court found that, if Tennessee's protocol "adequately ensured that Mr. Harbison would become and would stay unconscious from

_____

[4] The amended counts contained in the proposed Second Amended Complaint contain the same type of allegations.  (*See* Docket No. 169, Ex. 1 ¶¶ 102 ("The use of sodium thiopental as administered under the Tennessee Protocol does not cause sufficient anesthesia for the duration of the lethal injection process."), 122 ("The use of pancuronium bromide . . . will cause Mr. Harbison to suffocate or asphyxiate to death.  Suffocation is physically painful . . . [and] creates several minutes of psychological terror . . . ."), 135 ("Because the Tennessee Protocol, as designed, fails to induce unconsciousness, Mr. Harbison will suffer excruciating pain during the administration of the potassium chloride . . . .").)

9

the first drug, then he would suffer no pain during his execution." *Harbison*, 511 F. Supp. 2d at 884. The court's decision made it clear that "[h]ow great or small a risk of a 'grotesquely painful experience' Mr. Harbison faces is determined by how likely it is that he actually will be under-dosed with anaesthesia and, therefore, conscious at the time the second and third drugs are administered," and the court analyzed the risk that "[Harbison] will not receive the intended five grams of sodium thiopental before the injection of pancuronium bromide." *Id.* In reversing this court, the Sixth Circuit found that the risk of inadequate anesthesia "did not rise to the level of a constitutional violation." *Harbison*, 571 F.3d at 536.

In sum, Counts Two, Three, and Four are effectively indistinguishable from the counts that Harbison concedes were adjudicated.[5] They do not, as the plaintiff suggests, contain separate theories of liability. Because these counts were adjudicated, any amendment, absent new factual allegations, must be denied as futile.

### 2. Count Seven

Harbison also seeks to amend Count Seven, which he argues is still pending. (Docket No. 169 at 4.) That count alleges that Tennessee's protocol violates the federal Controlled

---

[5] The parties discuss the application of Federal Rule of Civil Procedure 54(b), but this is a red herring. (*See* Docket No. 169 at 2; Docket No. 171 at 3-4; Docket No. 175 at 8-10). That rule allows a court to "direct entry of a final judgment as to one or more, but fewer than all, claims" if it "expressly determines that there is no just reason for delay." Fed. R. Civ. P. 54(b). Otherwise, a judgment as to fewer than all claims is interlocutory and is generally not immediately appealable.

Here, the absence of a Rule 54(b) determination does not conclusively establish that the court's Order was final as to all of Harbison's claims. Even if the Order was interlocutory, the Sixth Circuit would have had appellate jurisdiction under 28 U.S.C. § 1292, which grants jurisdiction over appeals of interlocutory orders "granting . . . injunctions." *Id.* § 1292(a)(1).

10

Substances Act, 21 U.S.C. § 801 *et seq.*, because it calls for controlled substances to be dispensed without a doctor's prescription. (Docket No. 63 ¶¶ 178-81.)

Although this court's decision did not explicitly address Count Seven, this was because Harbison abandoned the claim after trial. If a plaintiff fails to include arguments regarding a claim in a post-trial brief, the court is justified in finding that the plaintiff has abandoned that claim. *See Coston v. Petro*, 398 F. Supp. 2d 878, 880-81 (S.D. Ohio 2005) ("[I]n their post-trial brief, Plaintiffs did not submit proposed findings of facts and conclusions of law for the claims asserted in Counts I, V, VI, and VIII of the complaint. Accordingly, the Court concludes that Plaintiffs have abandoned these claims."); *see also Black Law Enforcement Officers Ass'n v. Akron*, No. 89-3743, 1990 U.S. App. LEXIS 21742, at *13 (6th Cir. Dec. 11, 1990) (affirming a district court's determination "that the appellants had abandoned [certain] claims because they did not address them in their post-trial brief"); *United States v. Livecchi*, 605 F. Supp. 2d 437, 451 (W.D.N.Y. 2009) ("Defendants' post-trial brief contains no discussion of their second counterclaim . . . . On this record, this Court finds that defendants have abandoned their second counterclaim."); *Amara v. CIGNA Corp.*, 534 F. Supp. 2d 288, 359 n.49 (D. Conn. 2008) ("The Court construes Plaintiffs' failure to pursue their § 204(g) claim in their post-trial briefing as an indication that they have abandoned this claim . . . ."); *Coalition of Concerned Citizens against I-670 v. Damian*, 608 F. Supp. 110, 113 n.1 (S.D. Ohio 1984) ("Further, plaintiffs did not pursue their [National Environmental Policy Act] claims . . . in their post-trial brief. The Court considers these claims to have been abandoned as well.").

The evidentiary hearing in this case was not limited to only a subset of Harbison's

claims, and the plaintiff was free to present evidence regarding his federal drug law claim. *See*

*Harbison*, 511 F. Supp. 2d at 874 (stating that Harbison had filed an Amended Complaint and

that the hearing was held "to determine the merits of Mr. Harbison's claims."). After the

evidentiary hearing, both parties filed Proposed Findings of Fact and Conclusions of Law,

detailing the conclusions that they argued were warranted by the evidence. Harbison's 98-page

filing did *not* propose a finding that Tennessee's protocol violates the Controlled Substances

Act.[6] (*See* Docket No. 141.) Because his post-trial brief completely ignored Count Seven, the

court finds that Harbison abandoned the claim and that he cannot now revive it.

### C.    Additional Claims

#### 1.    Substantial Similarity

In addition to seeking leave to amend his pre-existing claims, Harbison seeks leave to

add a claim alleging that Tennessee's protocol is not substantially similar to Kentucky's. He

argues that the Sixth Circuit's decision "leaves open for consideration by this Court the factual

issue whether Tennessee's lethal injection protocol is substantially similar." (Docket No. 169 at

6.)

This is flatly incorrect. The Sixth Circuit unambiguously found that Tennessee's

---

[6] The plaintiff's Proposed Findings of Fact and Conclusions of Law did refer to testimony from Physician A, who pronounces death at the end of executions, that the three drugs are controlled substances and that he does not prescribe them. (Docket No. 141 at 30.) But the two sentences discussing this testimony are the only mention of evidence that could be considered relevant to Count Seven. Notably, this reference is contained in the document's "Summary and Assessment of Evidence" section, which simply summarized the trial testimony. It is not contained in the lengthy "Findings of Fact and Conclusions of Law" section, which laid out proposed rulings on Harbison's claims. (*See id.* at 56-96.)

12

protocol *is* substantially similar to Kentucky's. *Harbison*, 571 F.3d at 533, 536 ("Finding Tennessee's protocol substantially similar, we vacate the district court's judgment . . . ."; "Given the direction in *Baze* that a protocol substantially similar to Kentucky's would [be constitutional], Tennessee's protocol must be upheld . . . ."). The *Harbison* majority did not remand the case to allow this court to conduct further hearings.

In fact, that was the outcome advocated by the dissent. *See id.* at 540-41 (Clay, J., dissenting). The dissent complained that the majority "effectively usurp[ed] the district court's role as a factfinder and decide[d] an issue never presented to the district court: whether there are material differences between Kentucky's and Tennessee's lethal injection protocols." *Id.* at 540. In response, the majority stated that it "recogniz[ed] [its own] authority to fashion a remedy not requested by the parties," but "note[d] that neither party requested a remand in light of *Baze* in briefs or at oral arguments." *Id.* at 539 n.2. It remanded the case not for another evidentiary hearing, but for this court "to enter judgment consistent with [the majority's] decision." *Id.* at 539.

Thus, the Sixth Circuit contemplated, but ultimately decided against, allowing this court to hold further proceedings to determine whether Tennessee's protocol is substantially similar to Kentucky's. The plaintiff cannot now add a claim challenging the appellate court's holding.

### 2. New Autopsy Evidence

Finally, Harbison seeks to supplement his complaint with newly discovered autopsy evidence and to add a claim alleging that Tennessee's protocol, even when followed perfectly, creates an unconstitutional risk of severe pain. (Docket No. 169 at 4-6.)

13

At trial, Harbison introduced evidence regarding the execution of Robert Coe. Tennessee executed Coe in 2000, under a lethal injection protocol that used the same three drugs and the same dosages as the current protocol. A blood sample drawn during Coe's autopsy revealed that his sodium thiopental serum level – that is, the concentration of that drug in his blood – was 10.2 mg/L. Dr. Lubarsky, the plaintiff's expert, testified that this serum level was too low to ensure that Coe was unconscious during the execution. (TR 671.) The defendants' experts disputed Dr. Lubarsky's conclusions.

This was not the first time that Dr. Lubarsky had stated such conclusions based on postmortem serum levels. In 2005, he co-authored an article in the medical journal *Lancet* that examined blood samples from 49 executed inmates from various states. Mirroring Dr. Lubarsky's opinion regarding Coe, the article found that 21 of the prisoners had concentrations of sodium thiopental "'consistent with consciousness.'" *Baze*, 552 U.S. at 51 n.2 (quoting Koniaris, Zimmers, Lubarsky, & Sheldon, Inadequate Anaesthesia in Lethal Injection for Execution, 365 Lancet 1412, 1412-13). The article concluded that those prisoners might have experienced pain during the administration of pancuronium bromide and potassium chloride.

On October 24, 2007, after this court issued its decision but before the Sixth Circuit heard the appeal, autopsy results from executed Tennessee prisoner Philip Workman became available. The results showed that Workman's sodium thiopental serum level was 18.9 mg/L. (Docket No. 170, Ex. 1 ¶ 25.) More recently, Tennessee executed Steve Henley, and autopsy results released on March 10, 2010 showed a serum level of 8.31 mg/L. (*Id.* ¶ 34.) The plaintiff has attached an affidavit from Dr. Lubarsky asserting that the serum levels of Workman and

14

Henley were insufficient to ensure that they were unconscious during their executions.  (*Id.* ¶¶ 26, 31.)  Harbison argues that the supplementary evidence shows that "Tennessee's three-drug protocol, when carried out exactly as Defendants intend and without error, causes unnecessary pain and suffering."  (Docket No. 169 at 5.)

For the reasons described in previous sections, absent any new evidence, the court would enter judgment against the plaintiff and would dismiss all of his claims.  In this regard, Harbison's motion to supplement is akin to a motion under Rule 60(b), which allows relief from a final judgment based on "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial."  Fed. R. Civ. P. 60(b)(2).  "In order to prevail on a Rule 60(b)(2) motion, a movant must demonstrate (1) that it exercised due diligence in obtaining the information and (2) [that] the evidence is material and controlling and clearly would have produced a different result if presented before the original judgment.  In other words, the evidence cannot be merely impeaching or cumulative."  *Good v. Ohio Edison Co.*, 149 F.3d 413, 423 (6th Cir. 1998) (citations and quotation marks omitted) (alteration in original).  This is consistent with Rule 15(d), which requires Harbison to show that a new claim based on supplementary evidence is not futile.

As an initial matter, the court finds that Harbison has waived any claim that Tennessee's protocol is unconstitutional when followed perfectly.  "[A] party cannot raise claims it could have raised in a prior appellate proceeding."  *United States v. Mitchell*, 232 Fed. Appx. 513, 517 (6th Cir. 2007).  The Sixth Circuit specifically noted that, "[a]s in *Baze*, [Harbison] concede[d]

15

that if the protocol were followed perfectly, it would not pose an unconstitutional risk of pain."[7]

*Harbison*, 571 F.3d at 536 (citation omitted).  Harbison cannot now argue otherwise.  He made this concession despite the fact that the trial record contained testimony regarding the Coe autopsy,[8] and the fact that, by the time he filed his appellate brief, he knew the results of the Workman autopsy.[9]  Even if procedural considerations prevented the Sixth Circuit from considering the Workman evidence directly, the plaintiff could have argued that it warranted remand for a new evidentiary hearing.  He did not.  *See Harbison*, 571 F.3d at 539 n.2.

Regardless, the court finds that, had Harbison known of the Workman and Henley autopsy results before the bench trial, it would not have produced a different result.  Dicta from the Supreme Court's decision in *Baze* compels the conclusion that controversial evidence regarding postmortem sodium thiopental serum levels is not sufficient to show that Tennessee's three-drug protocol is unconstitutional.  *See Am. Civil Liberties Union of Ky. v. McCreary County*, No. 08-6069, 2010 U.S. App. LEXIS 11783, at *19 (6th Cir. June 9, 2010) ("Lower courts are 'obligated to follow Supreme Court dicta, particularly where there is not substantial reason for disregarding it, such as age or subsequent statements undermining its rationale.'"

---

[7] In his brief, Harbison argues that, unlike the petitioners in *Baze*, he did not "concede[] that the three drugs . . ., if properly administered, would not violate the Eighth Amendment." (Docket No. 175 at 6.)  Obviously, this is incorrect.

[8] Although this court's decision did not address Coe's serum level, this did not prevent Harbison from discussing the evidence on appeal.  The Sixth Circuit "may affirm on any grounds supported by the record even if different from the reasons of the district court."  *Dixon v. Clem*, 492 F.3d 665, 673 (6th Cir. 2007) (citation omitted).

[9] Harbison filed his brief on August 8, 2008, and his appeal was argued on January 20, 2009.  Both of these post-date the October 2007 autopsy results.

16

(quoting *United States v. Marlow*, 278 F.3d 581, 588 n.7 (6th Cir. 2002))).

Indeed, the plurality opinion specifically addressed the Lancet article that Dr. Lubarsky co-wrote.[10]  In *Baze*, the petitioners argued that a one-drug protocol was constitutionally mandated because it eliminated certain risks that are present in the three-drug protocol.  The plurality rejected this, holding that a prisoner cannot challenge a state's method of execution "merely by showing a slightly or marginally safer alternative."  *Baze*, 553 U.S. at 51.  Chief Justice Roberts wrote that the "difficulties inherent in such [an] approach[] are exemplified by the controversy surrounding" the 2005 Lancet article.  *Id.* at 51 n.2.

The Chief Justice noted that "peer responses by seven medical researchers criticized the methodology supporting the [article's] original conclusions" on the basis that blood samples "taken 'several hours to days after' the inmates' deaths . . . could not be relied on as accurate indicators for concentrations during life."  *Id.*  He continued:

> We do not purport to take sides in this dispute.  We cite it only to confirm that a "best practices" approach, calling for the weighing of relative risks without some measure of deference to a State's choice of execution procedures, would involve the courts in debatable matters far exceeding their expertise.

*Id.*  In other words, given the controversy regarding the accuracy of sodium thiopental serum levels in blood drawn more than several hours after death, evidence regarding such levels is not sufficient to invalidate a lethal injection protocol.

In his concurrence, Justice Alito stated this even more explicitly, holding that "an inmate

---

[10] The Sixth Circuit held that, in *Baze*, the plurality opinion is controlling.  *Harbison*, 571 F.3d at 535.

17

challenging a method of execution should point to a well-established scientific consensus." *Id.*
at 67 (Alito, J., concurring). Noting that Dr. Lubarsky's Lancet article had been "questioned,"
Justice Alito lamented "the lack of clear guidance in the currently available scientific literature."
*Id.* He concluded that "public policy on the death penalty, an issue that stirs deep emotions,
cannot be dictated by the testimony of an expert or two or by judicial findings of fact based on
such testimony." *Id.*

Finally, in his opinion, Justice Breyer reviewed the controversy over the Lancet article in
more detail. *Id.* at 108-10 (Breyer, J., concurring in the judgment). He stated that the article
may be "seriously flawed," and he discussed three published responses, which variously
concluded that sodium thiopental can diffuse from the bloodstream into surrounding tissues after
death, that time between the execution and the autopsy can affect serum levels, and that
postmortem serum levels can be extremely difficult to interpret. *Id.* at 109-10. Justice Breyer
noted that the parties did not actually discuss the Lancet article in their briefing. *Id.* at 110. This
fact, "*and the responses to the original study,*" caused him to conclude that "a judge, nonexpert
in these matters, cannot give the Lancet Study significant weight." *Id.* (emphasis added).

It seems clear that, in evaluating the constitutionality of a lethal injection protocol, six of
the Justices voting in *Baze* would not rely on controversial evidence regarding postmortem
sodium thiopental serum levels.[11] This is exactly the type of evidence upon which Harbison

---

[11] This includes the three Justices who signed on to the plurality opinion, Justice Breyer,
and Justices Thomas and Scalia. Justice Thomas, in a concurrence joined by Justice Scalia,
stated that "a method of execution violates the Eighth Amendment only if it is deliberately
designed to inflict pain." *Baze*, 553 U.S. at 94 (Thomas, J., concurring.) There is no allegation
that Tennessee's protocol is designed to deliberately cause pain, and the new evidence that

bases his new claim.

The hearing in this case illustrates the controversy regarding such evidence.  First, the court notes that Tennessee's protocol calls for five grams of sodium thiopental to be administered via four 1.25-gram injections.  *Harbison*, 511 F. Supp. 2d at 882.  This is more than ten times the dose usually given for clinical purposes.[12]  At trial, the undisputed testimony indicated that a five-gram dose, properly administered, is sufficient to cause a prisoner to remain unconscious during the entire execution.[13]  This is consistent with the expert testimony in *Baze*.

_____

Harbison seeks to introduce would be irrelevant to that determination.  In fact, the protocol "was designed to avoid the needless infliction of pain, rather than cause it."  *Harbison*, 571 F.3d at 534.

[12] Dr. Lubarsky testified that doses of 300 to 400 milligrams are typically used to induce anesthesia.  (TR 668.)  Dr. Levy testified that sodium thiopental is usually administered in doses between 100 and 250 milligrams and that doses rarely exceed 1 gram during a given procedure.  (TR 732.)

[13] The defendants' experts uniformly testified that, in addition to ensuring that prisoners would not feel pain as the second and third drugs were administered, five grams of sodium thiopental is enough to cause death in most people.  (*See* TR 713, 718, 722 (testimony of Dr. Bruce Levy), 762, 780-81 (testimony of Dr. Mark Dershwitz).)  Dr. Michael Higgins, a neutral expert appointed by the court, testified that five grams is a large enough dose that it does not need to be adjusted based on a prisoner's weight or size.  (TR 957.)

More importantly, the plaintiff's expert, Dr. Lubarsky, conceded that five grams is, in the abstract, a sufficiently large dose to cause unconsciousness.  Much of Dr. Lubarsky's testimony dealt with the various things that can go wrong when lay executioners attempt to administer anesthetic intravenously, which is a "complex, multi-step task that is basically the practice of medicine."  (TR 634.)  But he admitted:  "If I were to give you 5 grams of [sodium thiopental], I could probably figure out a way to make you go to sleep.  There is no doubt.  But that's because I know what I'm doing with the drug and I know what I'm doing with an IV . . . ."  (TR 636.)  He repeated this later in the hearing:

> Q.    So is it your opinion that 5 grams of sodium thiopental is
>       not sufficiently adequate anesthesia for a lethal injection
>       process?

*See Baze*, 553 U.S. at 59 ("[A] proper dose of thiopental obviates the concern that a prisoner will not be sufficiently sedated. All the experts who testified at trial agreed on this point."). This obviously contradicts the assertion that prisoners might remain conscious even if the protocol is followed perfectly.

Furthermore, the parties' experts disagreed regarding the proper interpretation of postmortem sodium thiopental serum levels. Dr. Bruce Levy, a forensic pathologist and one of the defendants' experts, testified that Coe's level of 10.2 mg/L did not indicate that he was conscious during the execution. Relying on Winek's Drug & Chemical Blood-Level Data 2001, a drug treatise, Dr. Levy testified that sodium thiopental can be lethal in serum levels as low as 10 mg/L, that therapeutic levels – i.e., levels associated with anesthesia – can range as low as 1 mg/L, and that toxic levels start as low as 7 mg/L.[14] (TR 713-14, 730.) Dr. Levy opined that, based on the serum level from the autopsy, Coe did not suffer pain and was not aware when the subsequent two drugs were administered. (TR 728, 738.) This conclusion would seem to apply equally to Workman and Henley; even Henley, who had the lowest serum level at 8.31 mg/L,

---

> A.  By itself, perhaps not. *In my hands, yes, it would be*. But in the hands of someone who doesn't know what they're doing, with the errors that we've described, I can't tell you for sure that it would be.

(TR 669 (emphasis added).) Of course, in *Baze*, the Supreme Court held that the types of errors noted by Dr. Lubarsky were insufficient to create an unconstitutional risk of pain. *See Harbison*, 571 F.3d at 536-39.

[14] Dr. Levy testified that therapeutic serum levels range from 1 to 42 mg/L, whereas lethal serum levels range from 10 to 400 mg/L. (TR 730-31.) This overlap occurs because patients who receive sodium thiopental in a clinical setting often receive respiratory and cardiovascular support, meaning that they are on a respirator or some other device. (*Id.*) Those patients can survive higher levels of the drug.

20

was within therapeutic levels and exceeded the low end of the range of toxic concentrations.

The defendants' other expert, Dr. Mark Dershwitz, who is an anesthesiologist and pharmacologist, echoed the published criticisms of Dr. Lubarsky's article. He testified that postmortem serum levels are unreliable because they fall rapidly after death:

> [W]e now have data suggesting that for thiopental levels to be meaningful in post-mortem blood and drug analysis, that blood sample must be drawn very shortly after death . . . . So the vast majority of the autopsy data that we have available to look at thiopental concentrations following death, those blood samples were drawn many hours or even days following the death. And those values are not representative of what the blood concentration was during life or at the time of death.

(TR 782; *see also* TR 783-86.) The autopsies on Coe, Workman, and Henley were each conducted at least seven hours after execution, which calls into question the usefulness of the serum levels.[15] *See Baze*, 553 U.S. at 51 n.2 (noting the controversy over blood samples "taken 'several hours to days after' the inmates' deaths").

Allowing the plaintiff to revive his claims based on the evidence from the Workman and Henley autopsies would, as the *Baze* plurality cautioned, "involve [this] court[] in debatable matters far exceeding [its] expertise." *Id.* at 51 n.2. Given "the lack of clear guidance in the currently available scientific literature," *id.* at 67 (Alito, J., concurring), Supreme Court precedent compels this court to give "deference to [Tennessee's] choice of execution procedures," *id.* at 51 n.2. Accordingly, any claim based on the plaintiff's new evidence would

---

[15] The autopsy reports submitted by the plaintiff indicate that Coe's autopsy was performed approximately 7 hours after execution, (Docket No. 169, Ex. 7 at 3), that Workman's was performed 10 days after execution, (Docket No. 170, Ex. 4 at 3), and that Henley's was performed more than 7 hours after execution, (*id.*, Ex. 5 at 2).

be futile.

**<u>CONCLUSION</u>**

For all of the reasons discussed above, the court will grant the defendant's motion and deny the plaintiff's motion. The injunction preventing Tennessee from executing Harbison will be vacated, and all of the plaintiff's claims will be dismissed with prejudice.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge