**IN THE UNITED STATES DISTRICT COURT FOR THE**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **EDWARD JEROME HARBISON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:06-cv-1206** |
| | ) | **Judge Trauger** |
| **GEORGE LITTLE, in his official capacity as Tennessee's Commissioner of Correction, *et al.*,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Pending before the court is the Motion to Alter or Amend filed by plaintiff Edward Jerome Harbison (Docket No. 179), to which the defendants have filed a response (Docket No. 182). For the reasons discussed herein, the plaintiff's motion will be denied.

## BACKGROUND

In the instant motion, the plaintiff, Edward Jerome Harbison, seeks to alter or amend the court's recent Order denying his Second Motion to Amend Complaint. The court will once again recount the factual and procedural background to this case.

Harbison was sentenced to death by the state of Tennessee in 1984 after being convicted of first-degree murder, second-degree burglary, and grand larceny.[1] His conviction withstood direct appeal in state court and collateral attack in federal court. In 2006, Harbison filed this 42

[1] Unless otherwise noted, the facts are drawn from the court's Memorandum regarding the plaintiff's Second Motion to Amend. (*See* Docket No. 177 at 1-4.) Citations to the trial transcript, which has been filed at Docket Nos. 138-39 and 142-43, will be noted as "(TR __.)."

U.S.C. § 1983 action, challenging the constitutionality of Tennessee's lethal injection protocol.

Tennessee's protocol calls for condemned prisoners to be injected successively with three drugs. In order, these are: (1) five grams of sodium thiopental, an anesthetic that renders the prisoner unconscious; (2) 100 milligrams of pancuronium bromide, a muscle paralytic that prevents the prisoner from moving and paralyzes the diaphragm, preventing the prisoner from breathing; and (3) 100 milliliters (of a 2 mEq/mL solution) of potassium chloride, which causes cardiac arrest. It is undisputed that, if the prisoner is not properly anesthetized by the sodium thiopental, the experience of being injected with the latter two drugs is excruciatingly painful. Harbison's central argument is that Tennessee's protocol creates a substantial risk that this will happen.

In September 2007, the court held a four-day bench trial on Harbison's claims. The court found that there were a number of flaws in the lethal injection procedure that could lead to improper administration of the sodium thiopental. Specifically, the protocol: (1) failed to require execution personnel to check the prisoner's level of consciousness after the sodium thiopental had been injected; (2) did not require adequate training for personnel regarding drug handling and intravenous catheterization; and (3) did not require personnel to monitor the IV lines during the administration of the drugs. *Harbison v. Little*, 511 F. Supp. 2d 872, 884-92 (M.D. Tenn. 2007). A state committee had recommended that Tennessee add measures to check for consciousness, but the Commissioner of Corrections rejected the recommendation. *Id.* at 898.

The court held that the three-drug protocol violated Harbison's Eighth and Fourteenth Amendment rights because it presented "a substantial risk of unnecessary pain" that was

disregarded by the Commissioner. *Id.* at 903. It also held that the Commissioner acted with deliberate indifference to the risk when he rejected the committee's advice to adopt the so-called one-drug protocol, under which the prisoner would receive only doses of sodium thiopental. *Id.* at 898. The court entered an injunction preventing Tennessee from executing Harbison via the three-drug protocol. (Docket No. 148.)

After the court issued its decision, the Supreme Court upheld the constitutionality of Kentucky's lethal injection protocol in *Baze v. Rees*, 553 U.S. 35 (2008). Kentucky's protocol employs the same three drugs as Tennessee's. The inmate petitioners in *Baze* argued that Kentucky's protocol was flawed because it allowed the employment of undertrained execution personnel, it did not provide safeguards to ensure effective intravenous catheterization, and it did not require personnel to test the prisoner's consciousness after administration of the sodium thiopental. *Id.* at 54-56. They also argued that Kentucky was constitutionally required to adopt the one-drug protocol. *Id.* at 56-60.

The Court issued a number of opinions, with the plurality opinion representing the views of three Justices.[2] Rejecting the inmates' arguments, the plurality held that Kentucky's protocol, as well as any protocol that is "substantially similar" to Kentucky's, is constitutional because it does not "create[] a demonstrated risk of severe pain." *Id.* at 61.

---

[2] Chief Justice Roberts wrote the plurality opinion, which was joined by Justices Kennedy and Alito; Justice Alito wrote a separate concurrence; Justice Stevens wrote an opinion concurring in the judgment that nevertheless questioned the justification for the death penalty; Justice Scalia wrote an opinion, joined by Justice Thomas, refuting Justice Stevens' view of the death penalty; Justice Thomas wrote an opinion, joined by Justice Scalia, concurring in the judgment; Justice Breyer wrote an opinion concurring in the judgment; and Justice Ginsburg, joined by Justice Souter, dissented.

The Sixth Circuit heard the instant defendants' appeal after *Baze* was decided. In *Harbison v. Little*, 571 F.3d 531 (6th Cir. 2009), *cert. denied*, 130 S. Ct. 1689 (2010), the appellate court found that Tennessee's lethal injection protocol is constitutional because it is substantially similar to Kentucky's. *Id.* at 537. The court stated that "*Baze* addressed the same risks identified by the trial court, but reached the conclusion that they did not rise to the level of a constitutional violation." *Id.* The Sixth Circuit then remanded the case to this court "to enter judgment consistent with [the circuit court's] decision." *Id.* at 539.

Upon remand, Harbison filed a Second Motion to Amend Complaint, seeking to amend certain claims that he argued were still pending and to add certain claims. (Docket No. 169.) Harbison also sought to supplement his claims with evidence gathered from autopsies performed on three executed Tennessee prisoners: Robert Coe, Philip Workman, and Steve Henley. The prisoners' postmortem sodium thiopental serum levels – that is, the concentration of the drug in the blood – were 10.2 mg/L, 18.9 mg/L, and 8.31 mg/L, respectively. The plaintiff's expert, Dr. David Lubarsky, opined that these levels were not high enough to ensure unconsciousness during execution. Harbison previously introduced evidence regarding Coe's serum level at the bench trial.[3] Results from the Workman autopsy became available after the bench trial but months before Harbison filed his appellate brief, and results from the Henley autopsy became available after the Sixth Circuit issued its opinion.

Contemporaneously with their response to Harbison's motion, the defendants filed a

---

[3] Although Coe was executed under a previous version of Tennessee's protocol, that protocol was similar to the current one, in that it called for a five-gram dose of sodium thiopental. Both Workman and Henley were executed under the current protocol.

Motion to Vacate Injunction and Enter Judgment, seeking dismissal of the case, consistent with the Sixth Circuit's opinion. (Docket No. 172.)

The court denied Harbison's motion and granted the defendants' motion. (Docket No. 178.) The court determined that its bench trial, and the subsequent Sixth Circuit decision, had disposed of all of the claims in the action. (Docket No. 177 at 7-12.) It also determined that, contrary to Harbison's argument, the Sixth Circuit's opinion did not allow this court to hold further hearings to determine whether Tennessee's protocol is "substantially similar" to Kentucky's. (*Id.* at 12-13.) Finally, the court, following clear dicta from the Supreme Court's *Baze* decision, refused to allow Harbison to supplement his complaint with evidence regarding postmortem serum levels, because such evidence is insufficient to invalidate a lethal injection protocol. (*Id.* at 13-22.)

## **ANALYSIS**

The plaintiff has now filed a Motion to Alter or Amend the court's ruling, pursuant to Federal Rule of Civil Procedure 59(e).

### I. Motion to Amend Standard

Federal Rule of Civil Procedure 59(e) allows a party to file a "motion to alter or amend a judgment . . . no later than 28 days after the entry of the judgment." The purpose of the rule "is to allow the district court to correct its own errors, sparing the parties and appellate courts the burden of unnecessary appellate proceedings." *Howard v. United States*, 533 F.3d 472, 475 (6th Cir. 2008) (quotation marks omitted). The court may grant a Rule 59(e) motion for one of three reasons: "(1) because of an intervening change in controlling law; (2) because evidence not

previously available has become available; or (3) because it is necessary to correct a clear error of law or prevent manifest injustice." *Gen. Truck Drivers, Chauffeurs, Warehousemen & Helpers, Local No. 957 v. Dayton Newspapers, Inc.*, 190 F.3d 434, 445 (6th Cir. 1999).

**II. Res Judicata**

Harbison argues that the Sixth Circuit's decision does not control the resolution of several counts contained in his First Amended Complaint. (Docket No. 179 at 2-3.) This court previously rejected that argument, holding that the Sixth Circuit's decision was res judicata as to all of the plaintiff's claims. The court's Memorandum explained its rationale in detail. (Docket No. 177 at 7-10.) Here, Harbison simply reiterates the arguments contained in his previous motion. This is not sufficient to support a motion to alter or amend. *See Gen. Truck Drivers*,190 F.3d at 445.

**III. Waiver**

In its previous Memorandum, the court held that Harbison has waived any claim that Tennessee's protocol is unconstitutional when followed perfectly. This determination was based partly on the fact that the Sixth Circuit's opinion specifically noted that, "[a]s in *Baze*, [Harbison] concede[d] that if the protocol were followed perfectly, it would not pose an unconstitutional risk of pain." (Docket No. 177 at 15-16 (quoting *Harbison*, 571 F.3d at 536 (citation omitted)) (alterations in original).) Harbison argues that he never made such a concession. (Docket No. 179 at 3-4.) In support, he has attached his appellate brief and a transcript of the Sixth Circuit oral argument. (Docket No. 179, Exs. 1-2.)

It appears that Harbison is correct – he did not explicitly concede that Tennessee's

protocol is constitutional if "followed perfectly." Nevertheless, Harbison *has* conceded that five grams of sodium thiopental, properly administered, is sufficient to render a prisoner unconscious. In the instant motion, Harbison admits that "anaesthesiologists . . . armed with 5 grams of sodium thiopental, can administer it in such a way as to cause unconsciousness."[4] (Docket No. 179 at 12 n.8.) This accords with the undisputed evidence at trial, which showed that a properly administered five-gram dose is enough to cause unconsciousness. (*See* Docket No. 177 at 19-20.)

Harbison argues that this concession is irrelevant to his claims, because "[t]he Tennessee protocol neither utilizes anaesthesiologists, nor vests in them the discretion to administer the drug." (Docket No. 179 at 12 n.8.) But, both at trial and on appeal, the main thrust of Harbison's argument was that Tennessee's executioners, who are not medical doctors, will inevitably err when intravenously administering the drug, preventing the prisoner from receiving the full dose; for example, the catheter might accidentally move from the vein to outer tissue. (*See* Docket No. 179, Ex. 1 at 78-84.) The Sixth Circuit rejected this argument.

"[A] party cannot raise claims it could have raised in a prior appellate proceeding." *United States v. Mitchell*, 232 Fed. Appx. 513, 517 (6th Cir. 2007). Thus, Harbison cannot now argue that Tennessee's lay executioners might, for some additional reason that Harbison previously failed to mention, cause a prisoner to receive less than the intended dose of sodium

---

[4] In addition, Harbison's appellate brief approvingly quoted testimony from the Commissioner of Corrections in which the Commissioner "conceded that he was aware of the benefits of a one-drug protocol" because "he knew five grams of sodium [thiopental], in and of itself, was sufficient to cause death 'if properly administered.'" (Docket No. 179, Ex. 1 at 37.)

thiopental. Any such argument has been waived.

Furthermore, because Harbison did not make any arguments to the Sixth Circuit regarding postmortem sodium thiopental serum levels, he has waived the argument that serum levels reveal constitutional flaws in the lethal injection protocol.[5] Harbison failed to make this argument, even though (1) the Coe evidence was in the appellate record and (2) the Workman evidence was available long before his appellate brief was due.[6] Harbison's brief framed the main question in the case as "whether there is a substantial risk that the condemned will not receive a dose of sodium thiopental that will render them unconscious" (Docket No. 179, Ex. 1 at 66), but he never argued that the two prisoners' postmortem serum levels prove this risk. This

---

[5] This court's decision after the bench trial did not directly address Coe's serum level, but this did not prevent Harbison from discussing the Coe evidence on appeal. The Sixth Circuit "may affirm on any grounds supported by the record even if different from the reasons of the district court." *Dixon v. Clem*, 492 F.3d 665, 673 (6th Cir. 2007) (quotation marks omitted).

[6] Harbison could have requested that the Sixth Circuit supplement the appellate record with the Workman autopsy results. The Sixth Circuit has held that it has "inherent equitable power to supplement the record" where, as would have been the case here, "'the interests of justice require.'" *Smith v. Anderson*, 402 F.3d 718, 727 n.5 (6th Cir. 2005) (quoting *Thompson v. Bell*, 373 F.3d 688, 690 (6th Cir. 2004)). Harbison did not make such a request.

Alternatively, Harbison could have requested a remand to allow this court to consider the new evidence. 20 Moore's Federal Practice - Civil § 310.10[5][e] (3d ed.) ("[R]ather than directly augment the record on appeal, the circuit court may remand the case for consideration by the district court in light of the previously unreviewed material.").

Harbison argues that, because he prevailed at the district court level, he was not required to seek such a remand. (Docket No. 179 at 14.) But the point of an appeal is to determine whether the lower court's decision was correct. Obviously, Harbison faced the possibility (and, eventually, the reality) that the legal findings of this court would be reversed. In that situation, a litigant with new, relevant evidence should request that, if the appellate court is inclined to find against him, the appellate court should remand for further factual hearings regarding the evidence. The case cited by the plaintiff, *Thompson v. Bell*, 580 F.3d 423 (6th Cir. 2009), is not to the contrary.

prevents him from making such an argument now.[7]

### IV. Sufficiency of Evidence Regarding Postmortem Serum Levels

In any event, the serum-level evidence that Harbison seeks to introduce is not sufficient to invalidate Tennessee's protocol, meaning that it would be futile to allow Harbison to supplement his claims with the evidence. (Docket No. 177 at 13-22.) As the court explained in its previous Memorandum, this result is compelled by clear dicta from the Supreme Court's decision in *Baze*. *See Am. Civil Liberties Union of Ky. v. McCreary County*, 607 F.3d 439, 447 (6th Cir. 2010) ("Lower courts are obligated to follow Supreme Court dicta, particularly where there is not substantial reason for disregarding it, such as age or subsequent statements undermining its rationale." (quotation marks omitted)).

The plurality opinion and two concurrences in *Baze* addressed an article co-authored by Dr. Lubarsky that examined postmortem sodium thiopental serum levels from nearly 50 executed prisoners and concluded that the levels were too low to ensure unconsciousness. The article, which was published in the medical journal *The Lancet*, came under attack from other medical researchers, who argued that blood samples taken more than several hours after execution did not reliably indicate serum levels at the time of death. *See Baze*, 553 U.S. at 51 n.2.

Chief Justice Roberts's plurality opinion warned that relying on such controversial evidence to invalidate a lethal injection protocol, "without some measure of deference to a State's choice of execution procedures, would involve the courts in debatable matters far

---

[7] The Henley autopsy data, although obtained after the Sixth Circuit issued its decision, is essentially cumulative of the Coe and Workman data.

exceeding their expertise."[8] *Id.* In a concurring opinion, Justice Alito stated that "an inmate challenging a method of execution should point to a well-established scientific consensus" and that "public policy on the death penalty, an issue that stirs deep emotions, cannot be dictated by the testimony of an expert or two or by judicial findings of fact based on such testimony." *Id.* at 67 (Alito, J., concurring). Similarly, Justice Breyer noted in his concurrence that, given the criticisms of the study, "a judge, nonexpert in these matters, cannot give the [study] significant weight." *Id.* at 110 (Breyer, J., concurring in the judgment).[9]

Harbison argues that this dicta is inapplicable because, in *Baze*, the Supreme Court did not have enough expert testimony to resolve the issues regarding postmortem serum levels. (Docket No. 179 at 7.) He claims that the evidence from the bench trial "demonstrates that there is *no controversy* regarding the accuracy of the sodium thiopental levels of inmates executed under *Tennessee's* protocol." (*Id.* at 11). This is simply incorrect.

At trial, Dr. Lubarsky testified that sodium thiopental serum levels tend to increase after death (TR 633), meaning that Coe's serum level at the time of execution was actually lower than 10.2 mg/L, making it more likely that he was conscious. Harbison points out that one of the

---

[8] The Sixth Circuit held that, in *Baze*, the plurality opinion is controlling. *Harbison*, 571 F.2d at 535.

[9] Together, these opinions account for four Justices – Chief Justice Roberts and Justices Alito, Kennedy, and Breyer. In addition, Justice Thomas, whose concurrence was joined by Justice Scalia, would find evidence of postmortem serum levels to be irrelevant: Justice Thomas stated that "a method of execution violates the Eighth Amendment only if it is deliberately designed to inflict pain," *Baze*, 553 U.S. at 94 (Thomas, J., concurring in the judgment), and it is undisputed that Tennessee's protocol "was designed to avoid the needless infliction of pain, rather than cause it." *Harbison*, 571 F.3d at 534. The court's Memorandum did not, as Harbison mistakenly claims (Docket No. 179 at 6 n.4), state that Justice Thomas directly addressed the *Lancet* study in his concurrence.

defendants' experts, Dr. Bruce Levy, testified that serum levels drop slowly, and that it is "not a process that occurs over just a few hours." (Docket No. 179 at 7-9 (quoting TR 739).) Thus, Harbison argues, because Coe's autopsy was performed approximately seven hours after his death, there is no question that the 10.2 mg/L serum level is an accurate indication of the serum level during execution.[10]

But Harbison ignores the fact that the defendants' other expert, Dr. Mark Dershwitz, testified that postmortem serum levels, such as those obtained in the Coe autopsy, are unreliable because they fall *rapidly* after death:

> [W]e now have data suggesting that for thiopental levels to be meaningful in post-mortem blood and drug analysis, that blood sample must be drawn very shortly after death . . . . So the vast majority of the autopsy data that we have available to look at thiopental concentrations following death, those blood samples were drawn many hours or even days following the death. And those values are not representative of what the blood concentration was during life or at the time of death.

(TR 782; *see also* TR 783-86.) This tracks the criticisms of the *Lancet* article discussed by the Supreme Court in *Baze*.[11] *See Baze*, 553 U.S. at 51 n.2.

Thus, the experts at trial did not unanimously agree on the reliability of Coe's postmortem sodium thiopental serum level. As the court has explained, the plurality opinion in

---

[10] Notably, however, Dr. Levy opined that Coe was unconscious during his execution. (TR 728, 738.)

[11] Harbison argues that "[this] case lacks the uncertainty of the *Lancet* article discussed in *Baze*," and he tries to distinguish the blood samples at issue here from the samples used in the *Lancet* study (Docket No. 179 at 10), which were drawn anywhere from "several hours to days" after execution, *Baze*, 553 U.S. at 51 n.2. But each of the autopsies here occurred at least seven hours after execution. Any criticism regarding the *Lancet* samples that were taken several hours after execution applies equally to the samples in this case.

*Baze* indicates that controversial serum-level evidence is not sufficient to overcome a state's choice of lethal injection protocol.[12] (Docket No. 177 at 13-22.) Invalidating the protocol on this basis would "involve the court[] in debatable matters far exceeding [its] expertise." *Baze*, 553 U.S. at 51 n.2. Accordingly, it would be futile to allow Harbison to supplement his claims.

**CONCLUSION**

In the end, this court is bound by the Sixth Circuit's decision that Tennessee's lethal injection protocol is substantially similar to the protocol found constitutional in *Baze*, as well as by the Supreme Court's dicta that evidence regarding postmortem sodium thiopental serum levels is not sufficient to invalidate a lethal injection protocol. For all of the reasons discussed above, the court will deny the plaintiff's motion. The court will not alter or amend its Order dismissing the plaintiff's claims with prejudice.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge

[12] Because there is controversy regarding the reliability of the postmortem sodium thiopental serum levels, it is unnecessary for the court to address whether there is also controversy regarding exactly what serum level is necessary to cause unconsciousness. (*See* Docket No. 179 at 11-13.)